

## DIP CREDIT AGREEMENT

Effective as of January ___, 2010 (the "**Effective Date**"), **THE CIT GROUP/COMMERCIAL SERVICES, INC.,** a New York corporation, with offices located at 11 West 42nd Street, 11th Floor, New York, New York 10036 (hereinafter "**CIT**"), is pleased to confirm the terms and conditions under which CIT may make loans and other financial accommodations to **CLASSIC SLEEP PRODUCTS, INC.,** a Delaware corporation, as debtor in possession, herein the "**Company**"), with its principal office located at the address set forth in Section 1(e) of the Schedule.

**SECTION 1    DEFINITIONS**   As used in this Agreement:

**Accounts** shall mean any and all of the Company's present and future: (a) accounts (as defined in the UCC); (b) instruments, documents, chattel paper (including electronic chattel paper) (all as defined in the UCC); (c) unpaid seller's or lessor's rights (including rescission, replevin, reclamation, repossession and stoppage in transit) relating to the foregoing or arising therefrom; (d) rights to any goods represented by any of the foregoing, including rights to returned, reclaimed or repossessed goods; (e) reserves and credit balances arising in connection with or pursuant to this Agreement; (f) guaranties, other supporting obligations, payment intangibles and letter of credit rights (all as defined in the UCC); (g) insurance policies or rights relating to any of the foregoing; (h) general intangibles pertaining to any of the foregoing (including rights to payment, including those arising in connection with bank and non-bank credit cards), and all books and records and any electronic media and software relating thereto; (i) notes, deposits or other property of the Company's account debtors securing the obligations owed by such account debtors to the Company; and (j) all amounts due from CIT with respect to the Eligible Factored Receivables (subject to all of Factor's rights under the Factoring Agreements); and (k) all Proceeds of any of the foregoing.

**Agreement** shall mean this DIP Credit Agreement, together with the Schedule and any other schedules, exhibits, supplements or annexes hereto, all as may be renewed, amended, restated or supplemented from time to time.

**Asset Purchase Agreement** shall have the meaning set forth in Section 6.22.

**Assignment of Proceeds** shall mean that certain Assignment and Intercreditor Agreement dated April 1, 2008 executed and delivered by the Company in favor of CIT pursuant to which the Company assigned to CIT all of its rights in and to the Proceeds and other monies due to the Company under the Factoring Agreements, including, without limitation, the right to receive all Proceeds of the Factoring Agreements, and all sums of money now due or which may hereafter become due to the Company under the Factoring Agreements.

**Availability** shall mean, at any time, the amount by which (a) the lesser of the Revolving Credit Limit or the Borrowing Base at such time exceeds (b) the outstanding balance of the Revolving Loan Account at such time.

**Availability Reserve** shall mean an amount equal to the sum of: (a) any reserve which CIT may establish from time to time pursuant to the express terms of this Agreement; plus (b) any additional reserves identified in Section 2.3 of the Schedule; plus (c) such other reserves against Availability as CIT deems necessary in its sole and absolute discretion as a result of (i) negative forecasts and/or trends in the Company's business, industry, prospects, profits, operations or financial condition or (ii) other issues, circumstances or facts that could otherwise negatively impact the Company or its business, prospects, profits, operations, industry, financial condition or assets; plus (d) to the full amount of any Carve-Out, to the extent that it applies to or is in any way imposed upon Collateral upon which CIT has a first priority lien or security interest.

**Avoidance Action Recoveries** shall mean any and all recoveries of cash, property or proceeds thereof in the Bankruptcy Case under any or all of Sections 502(d), 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code.

**Bankruptcy Case** shall mean the Company's case under Chapter 11 of the Bankruptcy Code, known as Case No. _____ in the Bankruptcy Court.

**Bankruptcy Case Expenses** shall mean CIT's fees and expenses (including reasonable attorneys' fees) in connection with the Bankruptcy Case (including, without limitation, attorneys' fees and expenses incurred in connection with any action to lift the automatic stay of Section 362 of the Bankruptcy Code, the prosecution of any motion to authorize the Company to obtain replacement post-petition financing and exit financing from CIT, and any other action or participation by CIT in the Bankruptcy Case or any defense or participation by CIT in any lender liability or other actions involving CIT).

**Bankruptcy Code** shall mean title 11 of the United States Code § 101 et seq., as in effect from time to time.

**Bankruptcy Court** shall mean the United States Bankruptcy Court for the District of Maryland, together with any other court having jurisdiction over the Bankruptcy Case or any proceedings therein from time to time.

**Bankruptcy Rule(s)** shall mean the Federal Rules of Bankruptcy Procedure, as amended from time to time.

**Base Rate** shall mean the rate of interest per annum announced by JPMorgan Chase Bank (or its successor) from time to time as its prime rate in effect at its principal office in New York City, which rate is not intended as the lowest rate of interest charged by JPMorgan Chase Bank to its borrowers.

**Base Rate Loan** shall mean a loan outstanding under this Agreement when the interest rate applicable thereto is based upon the Base Rate.

**Blocked Person** shall mean any person: (i) listed in the annex to Executive Order No. 13224, (ii) owned or controlled by, or acting for or on behalf of, any person listed in the annex to Executive Order No. 13224, (iii) with which CIT is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law, (iv) that commits, threatens or conspires to commit or supports "terrorism" as defined in Executive Order No. 13224, (v) a person that is named a "specially designated national" or "blocked person" on the most current list published by OFAC or other similar list, (vi) a person that is named a "denied person" on the most current list published by the U.S. Commerce Department, or (vii) (A) an agency of the government of a Sanctioned Country, (B) an organization controlled by a Sanctioned Country, or (C) a person resident in a Sanctioned Country to the extent subject to a sanctions program administered by OFAC.

**Borrowing Base** shall have the meaning set forth in Section 2.2 of the Schedule.

**Budget** shall mean the budget prepared in good faith based upon assumptions which the Company believes to be reasonable setting forth, inter alia, a thirteen (13) week cash flow forecast in reasonable detail satisfactory to CIT including receipts, disbursements and such line item detail as satisfactory to CIT, as well as projected borrowings and availability under this Agreement for such period, and attached hereto as **Exhibit A**.

**Budget Compliance** shall mean that as of any time of analysis, the actual amount of cash funds and receipts received by the Company and cash disbursements made and expenses incurred by the Company during the prior week or cumulative period do not vary from the Budget by an amount greater than ten percent (10%).

**Business Day** shall mean any day on which CIT is open for business in New York, New York.

**Carve-Out** shall have the meaning set forth in the Financing Orders entered by the Bankruptcy Court from time to time, and shall be in an aggregate amount not to exceed $120,000; provided, that in no case shall the Carve-Out be used for any purpose other than as permitted in a Financing Order.

**CIT's Bank Account** shall mean CIT's bank account at JPMorgan Chase Bank (or its successor) in New York, New York or such other account of CIT as CIT may designate from time to time.

**CIT's System** shall mean CIT's internet-based loan accounting and reporting system.

**Classic Brands** shall mean Classic Brands, LLC, a Delaware limited liability company.

**Classic Brands Sale** shall mean the sale of substantially all of the Company's assets to Classic Brands pursuant to the Asset Purchase Agreement.

**Collateral** shall mean all assets of the Company, including without limitation, all present and future Accounts, Equipment, Inventory and other Goods, Documents of Title, General Intangibles, Investment Property, Real Estate and Other Collateral, but shall not include the Avoidance Action Recoveries.

**Copyrights** shall mean all present and hereafter acquired copyrights, copyright registrations, recordings, applications, designs, styles, licenses, marks, prints and labels bearing any of the foregoing, all reissues and renewals thereof, all licenses thereof, all other general intangible, intellectual property and other rights pertaining to any of the foregoing, together with the goodwill associated therewith, and all income, royalties and other Proceeds of any of the foregoing.

**Default** shall mean any event specified in <u>Section 8.1</u> hereof, regardless of whether any requirement for the giving of notice, the lapse of time, or both, or any other condition, event or act has occurred or been satisfied.

**Deposit Money** shall mean the security deposit in the amount of $100,000 being held by Global Payment Inc.

**Depository Account** shall mean each bank account (and the related lockbox, if any) subject to CIT's control that is established by CIT, at CIT's option, or the Company pursuant to <u>Section 2.1.2</u> or <u>Section 5.1.11</u> hereof.

**Dilution Percentage** shall mean, with respect to the Company during any period of measurement, the quotient (expressed as a percentage) obtained by dividing (a) the aggregate amount of the Company's non-cash reductions against Trade Accounts (including Eligible Factored Receivables), during such period, <u>by</u> (b) the aggregate amount of the Company's gross collections during such period, as determined by CIT in the exercise of its reasonable business judgment.  The Dilution Percentage shall be determined by CIT based on its reviews of the periodic financial and collateral reports submitted by the Company to CIT as well as the results of the periodic field examinations of the Company conducted by CIT from time to time.  The period of measurement for calculating the Dilution Percentage shall be a trailing twelve month period or such other period determined by CIT from time to time in the exercise of its reasonable business judgment.

**DIP Revolver Maturity Date** shall have the meaning set forth in Section 6.1 of the Schedule.

**Documents of Title** shall mean all present and future documents (as defined in the UCC), and any and all warehouse receipts, bills of lading, shipping documents, chattel paper, instruments and similar documents, all whether negotiable or non-negotiable, together with all Inventory and other Goods relating thereto, and all Proceeds of any of the foregoing.

**Eligible Accounts** shall mean the (i) net amount of Eligible Factored Receivables and (ii) gross amount of the Company's Trade Accounts that are subject to a valid, exclusive, first priority and fully perfected security interest in favor of CIT (subject only to the first lien of the Factor so long as the Factoring Agreements have not been terminated and the Factor's lien in the Accounts shall not have been released, in which event upon such termination and release of lien, such Eligible Factored Receivables and Trade Accounts shall be subject to a first priority security interest in favor of CIT) in favor of CIT and as otherwise acceptable to CIT in its sole and absolute discretion, which conform to the warranties contained herein and which, in each case with respect to clauses (i) and (ii), at all times, continue to be acceptable to CIT in the exercise of its sole and absolute discretion, <u>less</u>, without duplication, the sum of:

(a)        Discounts, actual returns, discounts, claims, disputes, deductions, credits and allowances of any nature or any other circumstance giving rise to a chargeback (whether issued, owing, granted, claimed or outstanding), <u>plus</u>

(b)        reserves for such Trade Accounts that arise from, or are subject to or include: (i) sales to the United States of America, any state or other governmental entity or to any agency, department or division thereof, except for any such sales as to which the Company has complied with the Assignment of Claims Act of 1940 or any other applicable statute, rules or regulation to CIT's satisfaction in the exercise of its reasonable business judgment; (ii) other than with respect to Eligible Factored Receivables, but including Non-Risk Factored Receivables, foreign sales, other than sales which otherwise comply with all of the other criteria for eligibility hereunder and are (x) secured by letters of credit (in form and substance satisfactory to CIT) issued or confirmed by, and payable at, banks acceptable to CIT having a place of business in the United States of America, or (y) to customers residing in Canada, <u>provided</u> that such Accounts are payable in United States Dollars; (iii) such Accounts (other than with respect to Eligible Factored Receivables, but including Non-Risk Factored Receivables) that remain unpaid more than the earlier of one hundred twenty (120) days from invoice date or sixty (60) days from due date; (iv) contra accounts (except to the extent that CIT has received a no-offset letter in form and substance satisfactory to it, with respect to such contra accounts); (v) sales to any subsidiary (direct or indirect) or parent (direct or indirect) of the Company, or to any other person or entity otherwise affiliated with the Company or with any shareholder, subsidiary (direct or indirect) or parent (direct or indirect) of the Company in any way; (vi) bill and hold (deferred shipment), consignment sales, guaranteed sales, sale and return, sale on approval or other terms under which payment by the account debtor may be conditional or contingent; (vii) other than with respect to Eligible Factored Receivables, but including Non-Risk Factored Receivables, sales to any customer which is either (w) insolvent, (x) the debtor in any bankruptcy, insolvency, arrangement, reorganization, receivership or similar proceedings under any federal or state law, (y) negotiating, or has called a meeting of its creditors for purposes of negotiating, a compromise of its debts, or (z) financially unacceptable to CIT or has a credit rating unacceptable to CIT; (viii) other than with respect to Eligible Factored Receivables, but including Non-Risk Factored Receivables, all sales to any customer if fifty-percent (50%) or more of the aggregate dollar amount of all outstanding invoices to such customer are unpaid more than the earlier of one hundred twenty (120) days from invoice date or sixty (60) days from due date; (ix) the amount at any time that the aggregate outstanding sales to any customer and/or its affiliates exceeds twenty percent (20%) or more of all Eligible Accounts at such time; <u>provided</u> that with respect to sales to Bob's Discount Furniture and its affiliates, such percentage shall be sixty percent (60%), and with respect to sales to Sleepy's and its affiliates, such percentage shall be twenty five percent (25%); (x) pre-billed receivables and receivables arising from progress billings; and (xi) sales not payable in United States currency; and (xii) sales made to any customer that is a Blocked Person; <u>plus</u>

(c)        such reserves against Trade Accounts as CIT deems necessary in the exercise of its sole and absolute discretion and which are customary either in the commercial finance industry or in the lending practices of CIT.

**Eligible Factored Receivables** shall mean the Company's Trade Accounts that are purchased by Factor pursuant to the Factoring Agreements, the net proceeds from which are assigned to CIT pursuant to the Assignment of Proceeds, which conform to the terms, conditions, covenants, representations and warranties contained in the Factoring Agreements.

**Eligible In-Transit Inventory** shall mean all finished goods Inventory which is located outside of the United States of America but is in transit to one of the Company's locations and which (a) is owned by the Company, (b) is fully insured pursuant to a marine cargo policy, and CIT shall have received evidence of such insurance naming CIT as an additional insured and lender's loss payee, in form satisfactory to CIT, (c) is subject to a first priority security interest in and lien upon such goods in favor of CIT, (d) is subject to a Customs Broker/Freight Forwarder Agreement from all custom brokers/freight forwarders handling the Inventory, in form and substance satisfactory to CIT, which document(s) has/have been delivered to CIT, (e) is evidenced or deliverable pursuant to documents, notices, instruments, statements and bills of lading that are satisfactory to CIT and have been delivered to CIT or an agent acting on its behalf, (f) has not been in transit for more than sixty (60) days, and (g) is otherwise deemed to be "Eligible Inventory" hereunder.

**Eligible Inventory** shall mean the gross amount of the Company's Inventory that is subject to a valid, exclusive, first priority and fully perfected security interest in favor of CIT and which conforms to the warranties contained herein and which, at all times continues to be acceptable to CIT in the exercise of its sole and absolute discretion, <u>less</u>, without duplication, (a) all work-in-process, (b) all supplies (other than raw materials), (c) all Inventory not present in the United States of America (except for Eligible In-Transit Inventory), (d) all Inventory

returned or rejected by the Company's customers (other than goods that are undamaged and resalable in the normal course of business) and goods to be returned to the Company's suppliers, (e) all Inventory in transit (except for Eligible In-Transit Inventory) or in the possession of, or located with, a warehouseman, bailee, third party processor, or other third party, unless such warehouseman, bailee, third party processor or third party has executed a notice of security interest agreement or waiver agreement (in form and substance satisfactory to CIT), (f) all Inventory subject to a license agreement unless the licensor thereunder has executed a waiver (in form and substance satisfactory to CIT) and (g) the amount of such other reserves against Inventory as CIT deems necessary in the exercise of its reasonable business judgment, including, without limitation, reserves for customer deposits, special order, or private label goods, discontinued, slow-moving and obsolete Inventory, market value declines, bill and hold (deferred shipment), shrinkage and any applicable customs, freight, duties and taxes.

**Equipment** shall mean all present and hereafter acquired equipment (as defined in the UCC) including, without limitation, all machinery, equipment, rolling stock, furnishings and fixtures, and all additions, substitutions and replacements thereof, wherever located, together with all attachments, components, parts, equipment, auxiliary parts and accessories installed thereon or affixed thereto, whether the same constitutes personal property or fixtures and whether the interest therein is as owner, lessee or conditional vendee and all Proceeds of any of the foregoing.

**ERISA** shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

**Event of Default** shall have the meaning given to such term in Section 8.1 hereof.

**Existing Financing Agreements** shall mean that certain Financing Agreement between, among others, the Company and CIT, dated August 30, 2007, as amended, pursuant to which the Company has heretofore received financial accommodations including revolving loans and letter of credit guarantees in an amount of up to $6,200,000, and all related documents, instruments supporting obligations and agreements, contemplated thereby, as any or all of the foregoing have been amended, modified, supplemented or extended from time to time.

**Existing Term Loan** shall mean the term loan under the Existing Financing Agreement, in the outstanding principal amount of $106,666.61 as of the Effective Date.

**Factor** shall mean CIT, in its capacity as Factor pursuant to the Factoring Agreements, and its successors and assigns.

**Factoring Arrangements** shall mean the financial arrangements and other accommodations set forth in the Factoring Agreements.

**Factoring Agreements** shall mean the Factoring Agreement dated April 1, 2008 between the Company and Factor, as amended by that certain Amendment to Factoring Agreement dated on or about the Effective Date (the "**Factoring Agreement**"), together with all documents, instruments and agreements executed and delivered in connection with the Factoring Agreement, including, without limitation, the Assignment Agreement, the Customer Surcharge Letter Agreement, the Signature Card, the Trade Name Letter, the Certificate of Organization, Operating and Empowerment, and Payment Direction.

**Financing Order(s)** shall mean, as applicable, an order (whether the Interim Order or the Final Order) entered in the Bankruptcy Case, from time to time, in form and substance satisfactory to CIT, authorizing the Company to obtain the financing contemplated by and described in this Agreement.

**Filing Date** shall mean January 4, 2010.

**Final Order** shall mean a final order of the Bankruptcy Court in the Bankruptcy Case authorizing and approving this Agreement and the other Loan Documents under Sections 364(c) and (d) of the Bankruptcy Code, and entered at or after a final hearing, in form and substance satisfactory to CIT. The Final Order shall include, without limitation, provisions that have:

(a)      authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Revolving Credit Limit;

(b)      granted the claim and lien status and liens described in Section 4, and prohibited the granting of additional liens on the assets of Company, other than Permitted Encumbrances;

(c)      provided that such liens are automatically perfected by the entry of the Final Order and also granted to CIT;

(d)      granted relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable CIT, if CIT elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by CIT to perfect, protect and ensure the priority of its liens upon the Collateral as a matter of non-bankruptcy law;

(e)      provided that no Person will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out;

(f)      provided CIT with relief from the automatic stay in a manner consistent with the terms of Section 8.2;

(g)      provided that the Bankruptcy Case may not be dismissed unless the Obligations have been indefeasibly paid in full in cash and this Agreement has been terminated;

(h)      found that the credit extended hereunder and the negotiation of this Agreement and the other Loan Documents have been made and done in good faith and therefore the Obligations incurred and the granting, perfection and priority of the liens hereunder and thereunder are entitled to the protections in Section 364(e) of the Bankruptcy Code; and

(i)      confirming repayment in full, in cash, of all obligations owing to CIT as pre-petition lender under the Existing Financing Agreements of all sums due and owing to it, the refinancing of which shall constitute Obligations owing under this Agreement.

**GAAP** shall mean generally accepted accounting principles in the United States of America as in effect from time to time and for the period as to which such accounting principles are to apply.

**General Intangibles** shall mean all present and hereafter acquired general intangibles (as defined in the UCC), and shall include, without limitation, all present and future right, title and interest in and to: (a) all Trademarks, (b) Patents, utility models, industrial models, and designs, (c) Copyrights, (d) trade secrets, (e) licenses, permits and franchises, (f) any other forms of intellectual property, (g) all customer lists, distribution agreements, supply agreements, blueprints, indemnification rights and tax refunds, (h) all monies and claims for monies now or hereafter due and payable in connection with the foregoing, including, without limitation, payments for infringement and royalties arising from any licensing agreement between the Company and any licensee of any of the Company's General Intangibles, and (i) all Proceeds of any of the foregoing.

**Goods** shall mean all present and hereafter acquired goods (as defined in the UCC) and all Proceeds thereof.

**Guaranty** shall mean the guaranty, suretyship and security agreement executed and delivered to CIT by each Guarantor.

**Guarantor** shall mean any guarantor of all or any part of the Obligations.

**Interim Financing Order** means an order of the Bankruptcy Court in the Bankruptcy Case authorizing and approving this Agreement and the other Loan Documents on an interim basis under Sections 364(c) and (d) of the

Bankruptcy Code, and entered at or after a preliminary hearing under Rule 4001 of the Bankruptcy Code, in form and substance satisfactory to CIT. The Interim Financing Order shall include, without limitation, provisions that have:

        (a)     authorized the transactions contemplated by this Agreement and the extensions of credit under this Agreement in an amount not less than the Revolving Credit Limit;

        (b)     granted the claim and lien status and liens described in Section 4, and prohibited the granting of additional liens on the assets of the Company other than Permitted Encumbrances;

        (c)     provided that such liens are automatically perfected by the entry of the Interim Financing Order;

        (d)     granted relief from the automatic stay of Section 362(a) of the Bankruptcy Code to enable CIT, if CIT elects to do so in its discretion, to make all filings and recordings and to take all other actions considered necessary or advisable by CIT to perfect, protect and insure the priority of its liens upon the Collateral as a matter of non-bankruptcy law;

        (e)     provided that no Person, effective as of entry of the Final Order or any extension of the Interim Financing Order, will be permitted to surcharge the Collateral under Section 506(c) of the Bankruptcy Code, nor shall any costs or expenses whatsoever be imposed against the Collateral, except for the Carve-Out;

        (f)     provided CIT with relief from the automatic stay in a manner consistent with the terms of Section 8.2;

        (g)     provided that the Bankruptcy Case may not be dismissed unless the Obligations have been indefeasibly paid in full in cash and this Agreement has been terminated;

        (h)     found that the credit extended hereunder and the negotiation of this Agreement and the other Loan Documents have been made or done in good faith and therefore the Obligations incurred and the granting, perfection and priority of the liens hereunder and thereunder are entitled to the protections in Section 364(e) of the Bankruptcy Code; and

        (i)     approved the repayment in full, in cash of all obligations owing to CIT as pre-petition lender under the Existing Financing Agreements of all sums due and owing to them, the refinancing of which shall constitute Obligations owing under this Financing Agreement.

    **Inventory** shall mean all present and hereafter acquired inventory (as defined in the UCC) including, without limitation, all merchandise and inventory in all stages of production (from raw materials through work-in-process to finished goods), and all additions, substitutions and replacements thereof, wherever located, together with all goods and materials used or usable in manufacturing, processing, packaging, selling, promoting or shipping of the foregoing, and all Proceeds of any of the foregoing.

    **Investment Property** shall mean all present and hereafter acquired investment property (as defined in the UCC) together with all stock and other equity interests in the Company's subsidiaries, and all Proceeds thereof.

    **JMX Capital Partners** shall mean JMX Capital Partners, LLC, a Delaware limited liability company.

    **JMX Capital Partners Subordinated Debt** shall mean all indebtedness, liabilities, dividends and obligations of the Company in favor of JMX Capital Partners that is subordinated to the prior payment and satisfaction of the Obligations pursuant to a subordination agreement among JMX Capital Partners, CIT and the Company.

    **Loan Documents** shall mean this Agreement, mortgages and deeds of trust on any Real Estate, the Guaranty, the other closing documents executed by the Company or the Guarantor, the Factoring Agreements, the

Financing Orders, and any other ancillary loan and security agreements executed by the Company or the Guarantor from time to time in connection with this Agreement, all as may be renewed, amended, restated or supplemented from time to time.

**Non-Risk Factored Receivables** shall mean Eligible Factored Receivables for which Factor has not assumed the credit risk therefor.

**Obligations** shall mean: (a) all loans, advances and other extensions of credit made by CIT to the Company or to others for the Company's account (including, without limitation, all Revolving Loans and the Existing Term Loan); (b) any and all other indebtedness, obligations and liabilities which may be owed by the Company to CIT and/or the Factor and arising out of, or incurred in connection with, this Agreement or any of the other Loan Documents (including all Out-of-Pocket Expenses and the Loan Facility Fee), whether (i) now in existence or incurred by the Company from time to time hereafter, (ii) secured by pledge, lien upon or security interest in any of the Company's assets or property or the assets or property of any other person, firm, entity or corporation, (iii) such indebtedness is absolute or contingent, joint or several, matured or unmatured, direct or indirect, or (iv) the Company is liable to CIT for such indebtedness as principal, surety, endorser, guarantor or otherwise; (c) all indebtedness, obligations and liabilities owed by the Company to CIT and/or the Factor under any other agreement or arrangement now or hereafter entered into between the Company, on the one hand, and CIT and/or the Factor, on the other hand, whether or not such agreement or arrangement relates to the transactions contemplated by this Agreement or the Existing Financing Agreements; (d) indebtedness, obligations and liabilities incurred by, or imposed on, CIT as a result of environmental claims relating to the Company's operations, premises or waste disposal practices or disposal sites; (e) the Company's liabilities to CIT as maker or endorser on any promissory note or other instrument for the payment of money; and (f) the Company's liabilities to CIT under any instrument of guaranty or indemnity, or arising under any guaranty, endorsement or undertaking which CIT may make or issue to others for the Company's account, CIT's acceptance of drafts or CIT's endorsement of notes or other instruments for the Company's account and benefit.

**Other Collateral** shall mean: (a) all present and hereafter established lockbox, blocked account and other deposit accounts maintained with any bank or financial institution into which the proceeds of Collateral are or may be deposited (including the Depository Accounts); (b) all cash and other monies and property in the possession or control of CIT (including negative balances in the Revolving Loan Account and cash collateral held by CIT pursuant to this Agreement); (c) all books, records, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, credit files and other data relating to the Collateral or any account debtor, disks and related data processing software at any time evidencing or containing information relating to any of the Collateral described herein or otherwise necessary or helpful in the collection thereof or realization thereon; (d) the superpriority administrative expense claim to be included in the Financing Order; (e) all rights and interests of Company in property of the "estate" (within the meaning of the Bankruptcy Code); and (f) all Proceeds of any of the foregoing.

**Out-of-Pocket Expenses** shall mean all of CIT's present and future costs, fees and expenses incurred in connection with this Agreement and the other Loan Documents, including, without limitation, (a) the cost of lien searches (including tax lien and judgment lien searches), pending litigation searches and similar items, (b) fees and taxes imposed in connection with the filing of any financing statements or other personal property security documents; (c) all costs and expenses incurred by CIT in opening and maintaining the Depository Accounts and any related lockboxes, depositing checks, and receiving and transferring funds (including charges imposed on CIT for "insufficient funds" and the return of deposited checks); (d) all costs, fees and expenses incurred by CIT in connection with any action taken under Section 6.7 hereof, including reasonable travel, meal and lodging expenses of CIT personnel; (e) all costs that CIT may incur to maintain the insurance required hereunder and all reasonable costs, fees and expenses incurred by CIT in connection with the collection of insurance proceeds with respect to the Collateral and the monitoring of any repair or restoration of any Real Estate; (f) all reasonable costs, fees, expenses and disbursements of outside counsel hired by CIT to consummate the transactions contemplated by this Agreement (including the documentation and negotiation of this Agreement, the other Loan Documents and all amendments, supplements and restatements thereto or thereof), and to advise CIT as to matters relating to the transactions contemplated hereby; and (g) without duplication, all costs, fees and expenses incurred by CIT in connection with the administration, collection, liquidation, enforcement, protection and defense of the Obligations, the Collateral and CIT's rights under this Agreement, including, without limitation, all reasonable costs, fees, expenses and

disbursements of outside counsel to CIT incurred as a result of a workout, restructuring, reorganization, liquidation, insolvency proceeding and in any appeals arising therefrom, whether incurred before, during or after the termination of this Agreement or the commencement of any case with respect to the Company, the Guarantor or any subsidiary of the Company (as the case may be) under the United States Bankruptcy Code or any similar statute, including, without limitation, the Bankruptcy Case Expenses.

**Patents** shall mean all present and hereafter acquired patents, patent applications, registrations, all reissues and renewals thereof, all licenses thereof, all inventions and improvements claimed thereunder, all general intangible, intellectual property and other rights of the Company with respect thereto, and all income, royalties and other Proceeds of the foregoing.

**Permitted Encumbrances** shall mean: (a) liens existing on the Effective Date and set forth in Section 1(h) of the Schedule; (b) liens on Equipment acquired by the Company after the Effective Date, provided that (i) each such lien attaches only to the Equipment so acquired, (ii) a description of the Equipment so acquired is furnished by the Company to CIT, and (iii) the indebtedness secured by such liens does not exceed $25,000 in the aggregate at any time; (c) statutory liens of landlords and liens of carriers, warehousemen, bailees, mechanics, materialmen and other like liens imposed by law, created in the ordinary course of business and securing amounts not yet due (or which are being contested in good faith, by appropriate proceedings or other appropriate actions which are sufficient to prevent imminent foreclosure of such liens), and with respect to which adequate reserves or other appropriate provisions are being maintained by the Company in accordance with GAAP; (d) deposits made (and the liens thereon) in the ordinary course of business of the Company (including, without limitation, security deposits for leases, indemnity bonds, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, contracts (other than for the repayment or guarantee of borrowed money or purchase money obligations), statutory obligations and other similar obligations arising as a result of progress payments under government contracts; (e) liens granted to CIT by the Company; (f) liens of judgment creditors, provided that such liens do not exceed $25,000 in the aggregate at any time (other than liens bonded or insured to the reasonable satisfaction of CIT); (g) Permitted Tax Liens; and (h) easements (including, without limitation, reciprocal easement agreements and utility agreements), encroachments, minor defects or irregularities in title, variation and other restrictions, charges or encumbrances (whether or not recorded) affecting the Real Estate, if applicable, and which in the aggregate (i) do not materially interfere with the occupation, use or enjoyment by the Company of its business or property so encumbered and (ii) in the reasonable business judgment of CIT, do not materially and adversely affect the value of such Real Estate.

**Permitted Tax Liens** shall mean liens for taxes not yet due and payable and liens for taxes that the Company is contesting in good faith, by appropriate proceedings which are sufficient to prevent imminent foreclosure of such liens, and with respect to which adequate reserves are being maintained by the Company in accordance with GAAP; provided that in either case, such liens (a) are not filed of record in any public office, (b) are not senior in priority to the liens granted by the Company to CIT, or (c) do not secure taxes owed to the United States of America (or any departmental or agency thereof) or any State or State authority, if applicable State law provides for the priority of tax liens in a manner similar to the laws of the United States of America.

**Person** shall mean any individual, partnership, business entity, corporation, limited liability company, limited partnership, limited liability partnership, or other entity, including without limitation any governmental entity or the department thereof.

**Proceeds** shall have the meaning given to such term in the UCC, including, without limitation, all (a) payments or other proceeds from an insurance carrier with respect to any loss, casualty or damage to Collateral, and (b) payments received on account of any condemnation or other governmental taking of any Collateral.

**Real Estate** shall mean all of the Company's present and future fee and leasehold interests in real property, including the real property owned by the Company as of the Effective Date and described in Section 4.1 of the Schedule that will be subjected to a mortgage or deed of trust in favor of CIT.

**Revolving Credit Limit** shall mean the amount set forth in Section 2.1 of the Schedule.

**Revolving Line of Credit** shall mean the commitment of CIT to make Revolving Loans pursuant to Section 2.1 hereof, in an aggregate amount not to exceed the Revolving Credit Limit.

**Revolving Loan Account** shall mean the account on CIT's books, in the Company's name, in which the Company will be charged with all Obligations in accordance with Section 2.1.3 hereof.

**Revolving Loans** shall mean the loans made from time to time to or for the account of the Company by CIT pursuant to Section 2.1 of this Agreement.

**Schedule** shall mean the Schedule attached hereto and incorporated herein by reference.

**Subordinated Debt** shall mean all indebtedness of the Company (and the note(s) evidencing such indebtedness) that is subordinated to the prior payment and satisfaction of the Obligations pursuant to a subordination agreement between the subordinating creditor and CIT or by operation of law, including, without limitation, the JMX Capital Partners Subordinated Debt.

**Superpriority Claim** shall mean a claim against the Company in the Bankruptcy Case which is an administrative expense claim having priority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, including a claim pursuant to Section 364(c)(1) of the Bankruptcy Code.

**Trade Accounts** shall mean that portion of the Company's Accounts which arises from the sale of Inventory or the rendition of services in the ordinary course of the Company's business. Solely with respect to Annex A, Annex B and clauses (a)-(c) of the definition of Eligible Accounts, unless otherwise set forth therein, Trade Accounts shall include Eligible Factored Receivables.

**Trademarks** shall mean all present and hereafter acquired trademarks, trademark registrations, recordings, applications, tradenames, trade styles, corporate names, business names, service marks, logos and any other designs or sources of business identities, prints and labels (on which any of the foregoing may appear), all reissues and renewals thereof, all licenses thereof, all other general intangible, intellectual property and other rights pertaining to any of the foregoing, together with the goodwill associated therewith, and all income, royalties and other Proceeds of any of the foregoing.

**UCC** shall mean the Uniform Commercial Code as the same may be amended and in effect from time to time in the State of New York, provided, however, in the event that, by reason of mandatory provisions of law, the attachment, perfection or priority of CIT's security interest in any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the state of New York, then the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for the purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

**United States Trustee** shall mean the office of the United States Trustee.

**Working Day** shall mean any Business Day on which dealings in foreign currencies and exchanges between banks may be transacted

**SECTION 2     FINANCIAL COMMITMENTS**

Subject to the terms and conditions set forth in this Agreement, CIT agrees to make the following financial accommodations to the Company:

**2.1     Revolving Loans and Collections**

**2.1.1     Amounts and Requests.** Subject to the terms and conditions of this Agreement, CIT agrees to make loans and advances to the Company on a revolving basis (i.e. subject to the limitations set forth herein, the

Company may borrow, repay and re-borrow Revolving Loans) in amounts requested by the Company, but not in excess of the Availability on the date of the request therefor or the funding thereof until the DIP Revolver Maturity Date. All requests by the Company for a Revolving Loan must be received by CIT no later than 11:00 a.m., New York time on the Business Day that a Revolving Loan is required. The Company hereby authorizes CIT to make Revolving Loans to the Company based upon a telephonic or e-mail request (or, if permitted by CIT, based upon a request posted on CIT's System) made by any officer or other employee of the Company that the Company has authorized in writing to request Revolving Loans hereunder, as reflected by CIT's records. Each telephonic, e-mail or posted request by the Company shall be irrevocable, and the Company agrees to confirm any such request for a Revolving Loan in a writing approved by CIT and signed by such authorized officer or employee, within one (1) Business Day of CIT's request for such confirmation. CIT shall have the right to rely on any telephonic, e-mail or posted request for a Revolving Loan made by anyone purporting to be an officer or other employee of the Company that the Company has authorized in writing to request Revolving Loans hereunder, without further investigation.

### 2.1.2    Handling of Proceeds of Collateral; Cash Dominion.

(a)    **Collection of Accounts and Other Proceeds.** In the event of a termination of the Factoring Agreements, the Company, at its expense, will enforce and collect payments and other amounts owing on all Accounts in the ordinary course of the Company's business subject to the terms hereof. In addition, upon any such termination of the Factoring Agreements, the Company agrees to direct its account debtors and any credit card processors to send payments on all Accounts directly to a lockbox associated with a Depository Account or the Depository Account directly, as the case may be, and to include on all of the Company's invoices the address of such a lockbox as the sole address for remittance of payment. So long as the Factoring Agreements are not terminated, all accounts shall be collected and the proceeds thereof handled as provided in the Factoring Agreements. Notwithstanding the foregoing, should the Company ever receive any payment on an Account or other Proceeds of the sale of Collateral, including checks, cash, receipts from credit card sales and receipts, notes or other instruments or property with respect to any Collateral, so long as the Factoring Agreements have not been terminated and the Factor's lien on the Accounts shall not have been released, the Company agrees to hold such proceeds in trust for the Factor, and after the Factoring Agreements have been terminated and the Factor's lien on the Accounts shall have been released, the Company agrees to hold such proceeds in trust for CIT, in each case, separate from the Company's other property and funds, and to remit such proceeds as provided in the Factoring Agreements or deposit such proceeds directly into a Depository Account, as the case may be, on the Business Day received. All amounts received by CIT from the Factor pursuant to the Assignment of Proceeds will be credited to the Revolving Loan Account. No checks, drafts or other instruments received by CIT shall constitute final payment to CIT unless and until such instruments have actually been collected.

(b)    **Transfer of Funds from Depository Accounts.** Funds remaining on deposit in a Depository Account shall be transferred to CIT's Bank Account on each Business Day (except Veterans Day), and the Company agrees to take all actions reasonably required by CIT or any bank at which a Depository Account is maintained in order to effectuate the transfer of funds in this manner. Subject to Section 3.2.3 hereof, all amounts received from a Depository Account and any other proceeds of the Collateral deposited into CIT's Bank Account will, for purposes of calculating Availability and interest, be credited to the Revolving Loan Account on the date of deposit in CIT's Bank Account. No checks, drafts or other instruments received by CIT shall constitute final payment to CIT unless and until such instruments have actually been collected.

(c)    **New Depository Accounts.** The Company agrees not to open any lockbox or new bank account into which Proceeds of Collateral are to be delivered or deposited unless concurrently with the opening of such lockbox and/or bank account, CIT, the Company and the bank which will maintain such lockbox or at which such account will be maintained, execute a depository account control agreement, in form and substance satisfactory to CIT with respect to such lockbox and/or related bank account. Upon compliance with the terms set forth above, such lockbox and/or bank account shall constitute a Depository Account for purposes of this Agreement.

(d)    **Credit Card Receipts.** Promptly after the establishment of any credit card processing or depository relationship, the Company agrees to notify CIT in writing of the establishment of such relationship and shall use best efforts to cause the credit card processor to execute and deliver to CIT an agreement in form and substance satisfactory to CIT, pursuant to which the credit card processor agrees to deposit all sums due to the

Company pursuant to such arrangement directly to a Depository Account. The Company acknowledges and agrees that the deposit accounts established for the remittance of credit card receipts constitute Depository Accounts for purposes of this Agreement, subject to all of the provisions set forth in Section 2.1.2(a) above.

       **2.1.3**   **Revolving Loan Account.** CIT shall charge the Revolving Loan Account for all loans and advances made by CIT to the Company or for the Company's account, and at CIT's option for any other Obligations, including Out-of-Pocket Expenses, interest and fees when due and payable hereunder. The Company confirms that any charges which CIT may make to the Revolving Loan Account as provided herein will be made as an accommodation to the Company and solely at CIT's discretion, without notice to the Company.

       **2.1.4**   **Repayment of Overadvances.** If at any time the sum of the outstanding balance of the Revolving Loan Account exceeds either the Revolving Credit Limit (or any applicable sublimits thereof) or the Borrowing Base at such time, the amount of such excess shall be immediately due and payable, unless CIT otherwise agrees in writing. Should CIT for any reason honor requests for loans or advances in excess of Availability, such loans or advances shall be made in CIT's sole discretion and subject to any additional terms CIT deems necessary.

       **2.1.5**   **Application of Proceeds of Collateral.** CIT may apply all Proceeds of Collateral and all other payments received by CIT to the payment of the Obligations in accordance with the Loan Documents and consistent with the terms of any Financing Order.

       **2.1.6**   **Monthly Statement.** After the end of each month, CIT agrees to prepare and make available to the Company (by access to CIT's System or as otherwise mutually agreed to by the Company and CIT), a statement showing the accounting for the charges, loans, advances and other transactions occurring between CIT and the Company during that month. Absent manifest error, each monthly statement shall be deemed correct and binding upon the Company and shall constitute an account stated between the Company and CIT unless CIT receives a written statement of exception from the Company within thirty (30) days of the date of such monthly statement.

       **2.1.7**   **Access to CIT's System.** CIT shall provide to the Company access to CIT's System during normal business hours, for the purposes of obtaining information regarding loan balances and Availability. Such access shall be subject to the following terms, in addition to all terms set forth on the website for CIT's System:

           **(a)**   CIT shall provide to the Company an initial password for secured access to CIT's System. The Company shall provide CIT with a list of officers and employees that are authorized from time to time to access CIT's System, and the Company agrees to limit access to the password and CIT's System to such authorized officers and employees. After the initial access, the Company shall be solely responsible for (i) changing and maintaining the integrity of the Company's password and (ii) any unauthorized use of the Company's password or CIT's System by the Company's officers and employees.

           **(b)**   The Company shall use CIT's System and the Company's information thereon solely for the purposes permitted above, and shall not access CIT's System for the benefit of third parties or provide any information obtained from CIT's System to third parties. CIT makes no representation that loan balance or Availability information is or will be available, accurate, complete, correct or current at all times. CIT's System may be inoperable or inaccessible from time to time, whether for required website maintenance, upgrades to CIT's System, or for other reasons, and in any such event the Company must obtain loan balance and Availability information using other available means.

           **(c)**   The Company hereby confirms and agrees that CIT's System consist of proprietary software, data, tools, scripts, algorithms, business logic, website designs and interfaces and related intellectual property, information and documentation. CIT's System and related intellectual property, information and documentation are the sole and exclusive property of CIT, and the Company shall have no right, title or interest therein or thereto, except for the limited right to access CIT's System for the purposes permitted above. Upon termination of this Agreement, the Company agrees to cease any use of CIT's System.

**SECTION 3    INTEREST, FEES AND EXPENSES**

**3.1    Interest**

    **3.1.1    Interest on Revolving Loan Account.** Interest on the daily debit balance of the Revolving Loan Account at the close of each day during each month shall be due and payable monthly on the first day of the immediately following month and shall accrue at the applicable rate per annum set forth in <u>Section 3.1(a) of the Schedule</u>. In the event of any change in the Base Rate, the interest rate on Base Rate Loans shall change as of the date of such change. All interest rates shall be calculated based on a 360-day year and actual days elapsed.

    **3.1.2    Default Interest Rate.** Upon the occurrence of an Event of Default, all Obligations may, at the election of CIT, bear interest at a rate equal to two percent (2.0%) per annum greater than the applicable interest rate charged under this <u>Section 3.1</u> until such Event of Default is waived by CIT.

**3.2    Fees and Expenses**

    **3.2.1    Loan Facility Fee.** The Company agrees to pay CIT a Loan Facility Fee in the amount set forth in <u>Section 3.2 of the Schedule</u>, which shall be due and payable as set forth in <u>Section 3.2 of the Schedule</u>, but fully earned upon execution of this Agreement by CIT and the Company.

    **3.2.2    Line of Credit Fee.** On the first day of each month, the Company agrees to pay to CIT a Line of Credit Fee equal to the following: (a) (i) the Revolving Credit Limit <u>minus</u> (ii) the average daily balance of the Revolving Loan Account during the immediately preceding month, <u>multiplied by,</u> (b) the rate per annum set forth in <u>Section 3.3 of the Schedule</u> for the number of days in said month.

    **3.2.3    Standard Operational Fees.** In addition to all Out-of-Pocket Expenses and the other fees referenced herein and under the other Loan Documents, the Company agrees to pay CIT (a) CIT's standard fees for the use of CIT's in-house legal department (to the extent so used in lieu of outside counsel, as CIT may determine) relating to any and all modifications, waivers, releases, legal file reviews or additional collateral with respect to this Agreement, the Collateral and/or the Obligations, (b) CIT's standard charges for any employee of CIT used to conduct any of the examinations, verifications, inspections, physical counts and other valuations (currently $1,000 per person, per day), and (c) CIT's standard charges for each wire transfer made by CIT to or for the benefit of the Company (currently $35 per wire), provided that such standard charges may be increased by CIT from time to time. Such charges shall be due and payable in accordance with CIT's standard practices, as in effect from time to time.

    **3.2.4    Out-of-Pocket Expenses.** The Company agrees to reimburse or pay CIT for all Out-of-Pocket Expenses when charged to or paid by CIT.

**SECTION 4    COLLATERAL**

**4.1    Grant of Security Interest.** As security for the prompt payment in full of all Obligations, the Company hereby pledges and grants (and confirms and reaffirms its prior pledge and grant pursuant to the Existing Financing Agreements) to CIT a first priority continuing general lien and replacement lien under the Bankruptcy Code upon, and security interest in, all of the Collateral. The security interests granted hereunder shall extend and attach to all Collateral which is presently in existence or hereafter acquired (and whether acquired prior or subsequent to the commencement of the Bankruptcy Case) and which is owned by the Company or in which the Company has any interest, whether held by the Company or by others for the Company's account, and wherever located.

**4.2    Nature of Security Interest.** (a) The rights and security interests granted to CIT hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement or the fact that the Revolving Loan Account may from time to time be temporarily in a credit position, until the termination of this Agreement and the full and final payment and satisfaction of the Obligations. Any reserves or balances to the credit of the Company (in the Revolving Loan Account or otherwise), and any other property or assets of the Company in the possession of CIT, may be held by CIT as Other Collateral, and applied in whole or partial satisfaction of such Obligations when due, subject to the terms of this Agreement. The liens and security interests granted to CIT herein and any other lien or security interest which CIT may have in any other assets of the Company secure payment and performance of all

present and future Obligations.

(b)    Notwithstanding CIT's security interests in the Collateral, to the extent that the Obligations are now or hereafter secured by any assets or property other than the Collateral, or by the guaranty, endorsement, assets or property of any other person, CIT shall have the right in its sole discretion to determine which rights, security, liens, security interests or remedies CIT shall at any time pursue, foreclose upon, relinquish, subordinate, modify or take any other action with respect to, without in any way modifying or affecting any of such rights, security, liens, security interests or remedies, or any of CIT's rights under this Agreement.

(c)    Upon entry of the Financing Order, the liens and security interests granted to CIT under this Agreement and the Loan Documents shall be deemed good, valid and duly perfected liens and security interests in the Collateral, with the priorities set forth in the Financing Order, subject to no transfer or other restrictions or liens of any kind in favor of any other Person except for Permitted Encumbrances, and shall be perfected without the recordation of any UCC financing statements, notices of lien, mortgages or other instruments of assignment.

**4.3    Limited License.**  Regardless of whether CIT's security interests in any of the General Intangibles has attached or is perfected, the Company hereby irrevocably grants to CIT a royalty-free, non-exclusive license, to use the Company's Trademarks, Copyrights, Patents and other proprietary and intellectual property rights, in connection with the (i) advertisement for sale, and the sale or other disposition of, any finished or unfinished goods Inventory by CIT in accordance with the provisions of this Agreement, and (ii) the manufacture, assembly, completion and preparation for sale of any unfinished Inventory by CIT in accordance with the provisions of this Agreement.

**4.4    Collateral Reporting.**  Until the termination of this Agreement and the full and final payment and satisfaction of the Obligations, the Company agrees to furnish to CIT the reports, documents and information listed in Section 4.2 of the Schedule.

**4.5    Collateral Representations, Warranties and Covenants.**

**4.5.1    Generally.**  The Company represents, warrants and agrees that: (a) upon the filing of UCC financing statements covering the Collateral in all required jurisdictions, this Agreement creates a valid, perfected and first priority security interest in all personal property of the Company as to that property which may be perfected by filing and the security interests granted herein constitute the first and only liens on the Collateral except for Permitted Encumbrances; (b) the Company is, or will be at the time additional Collateral is acquired by the Company, the absolute owner of the Collateral with full right to pledge, sell, transfer and create a security interest therein, free and clear of any and all claims or liens in favor of others except for Permitted Encumbrances; and (c) the Company will, at its expense, forever warrant and, at CIT's reasonable request, defend the same from any and all claims and demands of any other person.

**4.5.2    Agreements Regarding Accounts and Inventory.**  (a) The Company represents and warrants to CIT that: (i) each Trade Account is, or will be when an additional Trade Account is created, based on an actual and bona fide sale and delivery of Inventory or rendition of services to customers, made by the Company in the ordinary course of its business; (ii) the invoices evidencing any such Trade Accounts are and will at all times be in the name of the Company; (iii) the customers of the Company have accepted the Inventory or services, owe and are obligated to pay the full amounts stated in the invoices according to their terms, without dispute, offset, defense, counterclaim or contra, except for disputes and other matters arising in the ordinary course of business which the Company has notified CIT pursuant to Section 4.4 hereof; (iv) each Trade Account included in any notice of borrowing, borrowing base certificate, report or other document as an Eligible Account meets all of the requirements of an Eligible Account set forth herein; and (v) the Company's Inventory is and will at all times be marketable in ordinary course of the Company's business, and no Inventory has been or will be produced in violation of the Fair Labor Standards Act (29 U.S.C. §201 et seq.), as amended.

(b)    The Company agrees to issue credit memoranda promptly upon accepting returns or granting allowances and to deliver to CIT copies of such credit memoranda as and when required to do so under Section 4.4 hereof. In no event shall prior recourse to any Account or other security granted to or by the Company be a prerequisite to CIT's right to demand payment of any of the Obligations. In addition, the Company agrees that

CIT shall have no obligation whatsoever to perform in any respect any of the Company's contracts or obligations relating to the Accounts.

(c)      The Company agrees not to acquire any Inventory on a consignment basis, nor co-mingle its Inventory with any goods of its customers or any other person (whether pursuant to any bill and hold sale or otherwise). The Company agrees to safeguard, protect and hold all Inventory for CIT's account and to make no sale or other disposition thereof except in the ordinary course of its business, on open account and on commercially reasonable terms consistent with the Company's past practices.   Notwithstanding the ordinary course of the Company's business and the Company's past practices, the Company agrees not to sell Inventory on a consignment basis, nor retain any lien on or security interest in any sold Inventory sold by the Company. As to any such sale, transfer, lease or other disposition of Inventory, CIT shall have all of the rights of an unpaid seller, including stoppage in transit, replevin, rescission and reclamation. Upon the occurrence of an Event of Default which has not been waived in accordance with this Agreement and on notice from CIT, the Company agrees that all returned, reclaimed or repossessed merchandise or goods shall be set aside by the Company, marked with CIT's name (as secured party) and held by the Company for CIT's account.

      **4.5.3**      **Agreements Regarding Equipment**.  The Company agrees to (i) maintain the Equipment in as good and substantial repair and condition as the Equipment is now maintained (or at the time that CIT's security interest may attach to the Equipment), reasonable wear and tear excepted, (ii) make any and all repairs and replacements when and where necessary, and (iii) safeguard, protect and hold all Equipment in accordance with the terms hereof and subject to CIT's security interest.  The Equipment will only be used by the Company in the operation of its business and will not be sold or held for sale or lease, except for obsolete Equipment or surplus Equipment from time to time, provided that in each such instance: (i) no Event of Default shall have occurred and remain outstanding at the time of such sale; (ii) the aggregate appraised value of the Equipment subject to sale does not exceed $25,000 in any fiscal year of the Company; and (iii) all net proceeds of such sales are either (x) promptly delivered by the Company to CIT by deposit to the Depository Account, for application to Obligations in such manner and in such order as CIT may elect in the exercise of its reasonable business judgment, or (y) within 90 days of such sale, used to purchase replacement Equipment that the Company determines in its reasonable business judgment to have a value at least equal to the Equipment sold.  As to any such sale, transfer, lease or other disposition of Equipment, CIT shall have all of the rights of an unpaid seller, including stoppage in transit, replevin, rescission and reclamation.

      **4.5.4**      **Agreements Regarding General Intangibles**.  The Company represents and warrants to CIT that as of the date hereof, the Company possesses all General Intangibles necessary to conduct the Company's business as presently conducted.  The Company agrees to maintain the Company's rights in, and the value of, all such General Intangibles, and to pay when due all payments required to maintain in effect any licensed rights.  The Company shall provide CIT with adequate notice of the acquisition of rights with respect to any additional Patents, Trademarks and Copyrights so that CIT may, to the extent permitted under the documentation granting such rights or applicable law, perfect its security interest in such rights in a timely manner.

      **4.5.5**      **Commercial Tort Claims and Letter of Credit Rights**.  The Company represents and warrants to CIT that as of the date hereof, the Company holds no interest in any commercial tort claims and the Company is not the beneficiary of any letter of credit.  If the Company at any time holds or acquires a commercial tort claim or becomes a beneficiary under any letter of credit, the Company shall promptly notify CIT in writing thereof and shall execute such further documents or do such further acts as CIT may reasonably request to grant to CIT valid and perfected first priority security interests in such commercial tort claims and letters of credit, as the case may be.

      **4.5.6**      **Further Assurances**.  The Company agrees to comply with the requirements of all state and federal laws in order to grant to CIT valid and perfected first priority security interests in the Collateral.   CIT is hereby authorized by the Company to file from time to time any financing statements, continuations or amendments covering the Collateral without the Company's signature in accordance with the provisions of the UCC.   The Company hereby consents to and ratifies the filing of any financing statements covering the Collateral by CIT on or prior to the Effective Date. The Company agrees to do whatever CIT may reasonably request, from time to time, by way of: (a) filing notices of liens, financing statements, amendments, renewals and continuations thereof; (b) cooperating with CIT's agents and employees; (c) keeping Collateral records; (d) transferring proceeds of Collateral to CIT's possession in accordance with the terms hereof; (e) obtaining waivers from landlords, warehousemen, third

party processors and mortgagees; and (f) performing such further acts as CIT may reasonably require in order to effect the purposes of this Agreement.

**SECTION 5     CONDITIONS PRECEDENT**

**5.1     Conditions Precedent to Initial Funding.**  The obligation of CIT to make the initial loans and financial accommodations hereunder is subject to the satisfaction of the following conditions precedent:

**5.1.1     Loan Documents.**  The Company and any Guarantor shall have executed and delivered to CIT this Agreement and all Loan Documents required by CIT or its counsel to consummate the lending arrangement contemplated between the Company and CIT.

**5.1.2     Lien Searches.**  CIT shall have received tax, judgment, litigation, and UCC searches from all jurisdictions reasonably required by CIT, and such searches shall verify that CIT has a first priority security interest in the Collateral and any other assets securing the Obligations, subject to Permitted Encumbrances.

**5.1.3     Insurance.**  The Company shall have delivered to CIT evidence satisfactory to CIT that: (i) all insurance required by this Agreement is in full force and effect and (ii) CIT has been named as loss payee with respect thereto in a manner satisfactory to CIT.

**5.1.4     UCC Filings.**  All UCC financing statements and similar documents required to be filed in order to create in favor of CIT a first priority perfected security interest in the Collateral and any other assets securing the Obligations (to the extent that such a security interest may be perfected by a filing under the UCC or applicable law) shall have been properly filed in each office in each jurisdiction required.  CIT shall have received (i) acknowledgment copies of all such filings and (ii) evidence that all necessary filing fees, taxes and other expenses related to such filings have been paid in full.

**5.1.5     Budget.**  CIT shall have received, reviewed and been satisfied with the Budget.

**5.1.6     Indebtedness.**  The Company shall have no other indebtedness outstanding and owing to any Person after the Effective Date other than (a) trade accounts payable and other indebtedness specifically permitted by CIT in its sole discretion, (b) Subordinated Debt which is fully subordinated to CIT on terms and conditions acceptable to CIT, in its sole discretion, and (c) unsecured pre-petition indebtedness as disclosed in the Company's schedules and statements of financial affairs filed with the Bankruptcy Court, as the same may be amended, and proofs of claim filed against the Company, subject to intercreditor and subordination agreements in form and substance satisfactory to CIT in CIT's sole discretion.

**5.1.7     Pleadings, Etc.**  The pleadings, documents, schedules and other submissions filed in the Bankruptcy Case shall have been reviewed by CIT and CIT's counsel, and the terms and conditions of such materials shall be deemed satisfactory in CIT's sole discretion.

**5.1.8     Examination & Verification.**  CIT shall have completed and be satisfied with an updated examination and verification of the Accounts, Inventory and books and records of the Company.

**5.1.9     Repayment on Pre-Petition Obligations.**  CIT shall have received payment in full, in cash, of all of the pre-petition Obligations under the Existing Financing Agreements, other than the Existing Term Loan.

**5.1.10     JMX Capital Partners Subordinated Debt.**  JMX Capital Partners shall have paid the Subordinated Debt to the Company, in immediately available funds, in an amount not less than $750,000, and the Company shall have remitted such amount, in immediately available funds, to CIT to pay down the Revolving Loan Account.  In addition, JMX Capital Partners shall have entered into a subordination agreement with CIT in form and substance satisfactory to CIT in its sole discretion.

**5.1.11   Certain Bankruptcy Case Matters**.

        **(a)**    **Compliance with Requirements**.  The Company shall have complied in full with the notice and other requirements of the Bankruptcy Code and the related local and Federal rules of bankruptcy procedure in a manner acceptable to CIT and its counsel.

        **(b)**    **Finding of Good Faith**.  The Bankruptcy Court shall have found that the Revolving Loans contemplated by this Agreement are made by CIT, and that all other Obligations are incurred by Company hereunder in "good faith" within the meaning of Section 364(e) of the Bankruptcy Code.

        **(c)**    **Interim Financing Order**.  The Bankruptcy Court shall have entered the Interim Financing Order by no later than seven (7) days after the Filing Date in form and substance satisfactory to CIT, which Interim Financing Order shall: (i) have been entered upon application or motion of the Company reasonably satisfactory in form and substance to CIT and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by CIT; (ii) be in full force and effect and shall not have been amended, modified or stayed without the written consent of CIT or reversed; and (iii) not be the subject of a pending objection, appeal or motion for reconsideration in any respect.  The Company and CIT shall be entitled to rely in good faith upon the Interim Financing Order notwithstanding any such objection, appeal or motion for reconsideration. CIT shall be permitted, and the Company shall be required, to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection, appeal or motion for reconsideration unless the Interim Financing Order has been stayed by a court of competent jurisdiction.

        **(d)**    **First Day Orders**.  CIT shall have received drafts of the "first day" pleadings in form and substance satisfactory to CIT on or before the date of the initial loans hereunder.

        **(d)**    **Fees, Costs and Expenses**.  CIT shall have received all fees, costs and expenses due and payable on or prior to the Effective Date.

        **(e)**    **Patriot Act**.  CIT shall have received all documentation and other information required by bank regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including, without limitation, the United States Patriot Act and OFAC.

**5.2**    **Conditions to Each Extension of Credit**.  The obligation of CIT to make any loans and financial accommodations hereunder (including, without limitation, the initial extension of credit) shall expire on the DIP Revolver Maturity Date and is otherwise subject to the satisfaction of the following conditions precedent:

    **5.2.1**    **Representations and Warranties**.  Each of the representations and warranties made by the Company in or pursuant to this Agreement, including all representations and warranties in a borrowing base certificate, shall be true and correct in all material respects on and as of the date of such loan or financial accommodation as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date.

    **5.2.2**    **No Default or Material Adverse Change**.  No Default or Event of Default shall have occurred and be continuing or would result from the making of such loan or financial accommodation and no material adverse change shall have occurred in the financial condition, business, prospects, profits, operations or assets of the Company, the Guarantor or the Company's affiliates since the date of the latest financial statements delivered to CIT prior to the Effective Date.

    **5.2.3**    **Budget Variance**.  The actual amount of cash funds and receipts received by the Company and cash disbursements made and expenses incurred by the Company during the prior week or cumulative period do not vary from the Budget approved by CIT for such period by an amount greater than ten percent (10%).

    **5.2.4**    **Compliance with Financing Orders**.  The extension of credit requested shall not cause the aggregate outstanding amount of the Line of Credit to exceed the amount then authorized by the applicable Financing Order, as the case may be, or any order modifying, reversing, staying or vacating such order shall have been entered or any appeal of such order shall have been timely filed.

**5.2.5** **Final Order**. Within twenty-five (25) days of the Filing Date, and for each extension of credit thereafter, CIT shall have received satisfactory evidence of the entry of the Final Order.

**5.2.6** **Financing Order**. The Final Order, or, prior to the entry of the Final Order, the Interim Financing Order, (i) shall have been entered upon application or motion of the Company reasonably satisfactory in form and substance to CIT and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by CIT; (ii) shall be in full force and effect and shall not have been amended, modified or stayed without the written consent of CIT or reversed; and (iii) not be the subject of a pending objection, appeal or motion for reconsideration in any respect. The Company and CIT shall be entitled to rely in good faith upon the applicable Financing Order notwithstanding any such objection, appeal or motion for reconsideration. CIT shall be permitted, and the Company shall be required, to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection, appeal or motion for reconsideration unless the applicable Financing Order has been stayed by a court of competent jurisdiction.

**SECTION 6** **REPRESENTATIONS, WARRANTIES AND COVENANTS.** The Company represents and warrants to CIT as follows, and the Company covenants that the following representations will continue to be true, and that the Company will at all times comply with all of the following covenants until the termination of this Agreement and the full and final payment and satisfaction of the Obligations:

**6.1** **Organization Matters; Collateral Locations.** Section 1 of the Schedule correctly and completely sets forth (a) the Company's exact name, as currently reflected by the records of the Company's State of incorporation or formation, (b) the Company's State of incorporation or formation, (c) the Company's federal employer identification number and state organization identification number (if any), (d) the address of the Company's chief executive office and all locations of Collateral, and (e) the names and jurisdictions of incorporation of all subsidiaries of the Company.

**6.2** **Financial and Other Information.** All financial statements of the Company previously or hereafter furnished to CIT present fairly, in all material respects, the financial condition of the Company as of the date of such financial statements. All written information now or heretofore furnished by the Company to CIT is true and correct as of the date with respect to which such information was furnished. None of the pleadings, agreements, documents and certificates filed with the Bankruptcy Court in connection with the Bankruptcy Case, at the time of filing, contained any untrue statement of a material fact or omitted to state any fact necessary in order to make such filing, in light of the circumstances under which it was made, not misleading.

**6.3** **Power and Authority; Conflicts; Enforceability.** (a) The Company has full power and authority to execute and deliver this Agreement and the other Loan Documents to which it is a party, and to perform all of the Company's obligations thereunder.

**(b)** The execution and delivery by the Company of this Agreement and the other Loan Documents to which it is a party, and the performance of the Company's obligations thereunder, have been duly authorized by all necessary corporate or other relevant action, and do not (i) require any consent or approval of any director, shareholder, partner or member of the Company that has not been obtained, (ii) violate any term, provision or covenant contained in the organizational documents of the Company (such as the certificate or articles of incorporation, certificate of origin, partnership agreement, by-laws or operating agreement), (iii) violate, or cause the Company to be in default under, any law, rule, regulation, order, judgment or award applicable to the Company or its assets, or (iv) violate any term, provision, covenant or representation contained in, or constitute a default under, or result in the creation of any lien under, any loan agreement, lease, indenture, mortgage, deed of trust, note, security agreement or pledge agreement to which the Company is a signatory or by which the Company or any of the Company's assets are bound or affected.

**(c)** This Agreement and the other Loan Documents to which the Company is a party constitute legal valid and binding obligations of the Company, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, moratorium, fraudulent transfer and other laws affecting creditors' rights generally, and subject to general principles of equity, regardless of whether considered in a proceeding at law or in equity.

18

(d)     The Company agrees to qualify to do business, and to remain qualified to do business and in good standing, in each jurisdiction where the failure to so qualify or to remain qualified or in good standing, would have a material adverse effect on the Company.

**6.4     Compliance with Laws.**  The Company and the Company's properties are and will continue to be in compliance with all federal, state and local acts, rules and regulations, and all orders of any federal, state or local legislative, administrative or judicial body or official, except to the extent the failure to so comply would not have a material adverse effect on the Company.  The Company has obtained and will continue to maintain all permits, approvals, authorizations and licenses necessary to conduct its business as presently conducted, except to the extent the failure to have such permits, approvals, authorizations or licenses would not have a material adverse effect on the Company.

**6.5     Environmental Matters. (a)**     None of the operations of the Company are the subject of any federal, state or local investigation to determine whether any remedial action is needed to address the presence or disposal of any environmental pollution, hazardous material or environmental clean-up of the Real Estate.  No enforcement proceeding, complaint, summons, citation, notice, order, claim, litigation, investigation, letter or other communication from a federal, state or local authority has been filed against or delivered to the Company, regarding or involving any release of any environmental pollution or hazardous material on any real property now or previously owned or operated by the Company.

(b)     The Company has no known contingent liability with respect to any release of any environmental pollution or hazardous material on any real property now or previously owned or operated by the Company.

(c)     The Company is and will continue to be in compliance with all environmental statutes, acts, rules, regulations and orders applicable to the operation of the Company's business, except to the extent that the failure to so comply would not have a material adverse effect.  The Company agrees to promptly notify CIT in writing of (i) any expenditure (actual or anticipated) in excess of $25,000 for environmental clean-up, environmental compliance or environmental testing and (ii) the Company's receipt of notice from any local, state or federal authority advising the Company of any environmental liability (real or potential).

**6.6     Pending Litigation.**  Except as previously disclosed by the Company to CIT in writing, there exist no actions, suits or proceedings of any kind by or against the Company pending in any court or before any arbitrator or governmental body, or to the best of the Company's knowledge threatened against the Company, that, individually or in the aggregate, could reasonably be expected to have a material adverse effect on the Company.

**6.7     Maintenance of Financial Records; Inspections.**  The Company agrees to maintain books and records pertaining to the Collateral and the Company's financial matters in such detail, form and scope as CIT reasonably shall require and agrees that such books and records will reflect CIT's interest in the Collateral.  The Company agrees that CIT or its agents may enter upon the Company's premises at any time during normal business hours, and from time to time, in order to (i) examine and inspect the books and records of the Company, and make copies thereof and take extracts therefrom, and (ii) verify, inspect and perform physical counts and other valuations of the Collateral and any and all records pertaining thereto.  The Company irrevocably authorizes all accountants and third parties to disclose and deliver directly to CIT, at the Company's expense, all financial statements and information, books, records, work papers and management reports generated by them or in their possession regarding the Company or the Collateral.  All out-of-pocket costs, fees and expenses incurred by CIT in connection with such examinations, inspections, physical counts and other valuations shall constitute Out-of-Pocket Expenses.

**6.8     Asset Appraisals.**  From time to time upon the request of CIT, the Company agrees to permit CIT to perform appraisals of the Company's Inventory.  The Company agrees to reimburse CIT for the costs and expenses relating to (i) two such appraisals in any twelve-month period, so long as no Event of Default shall have occurred and remains outstanding, and (ii) all such appraisals performed while an Event of Default remains outstanding.  All appraisals shall be performed by qualified appraisers selected by CIT.  To the extent that the Company is required by this Section 6.8 to reimburse CIT for CIT's costs and expenses relating to appraisals, such costs and expenses shall constitute Out-of-Pocket Expenses.

**6.9**     **Insurance.**  The Company agrees to maintain insurance, including, without limitation, insurance on the Company's assets, including, without limitation, the Real Estate, Equipment and Inventory, and marine cargo insurance, under such policies of insurance, with such insurance companies, in such reasonable amounts and covering such insurable risks as are at all times reasonably satisfactory to CIT. All policies covering the Company's assets, including, without limitation, the Real Estate, Equipment and Inventory are, to be made payable to CIT, in case of loss, under a standard non-contributory "lender" or "secured party" clause or endorsement, and are to contain such other provisions as CIT may require to fully protect CIT's interest in the Company's assets, including, without limitation, the Real Estate, Inventory and Equipment and to any payments to be made under such policies, including, without limitation, provisions (x) for not less than thirty (30) days prior written notice to CIT of the exercise of any right of cancellation or material change and (y) that CIT's right to payment under any property insurance policy will not be invalidated by any act or neglect of, or any breach of warranty or condition by, the Company or any party. All original policies or true copies thereof are to be delivered to CIT, premium prepaid, with such loss payable endorsement in CIT's favor.  If the Company fails to maintain such insurance on its assets, including, without limitation, the Real Estate, Equipment and Inventory, CIT may arrange for such insurance, but at the Company's expense and without any responsibility on CIT's part for: (i) obtaining the insurance; (ii) the solvency of the insurance companies; (iii) the adequacy of the coverage; or (iv) the collection of claims.  CIT may apply any insurance proceeds to the cost of repairs, or replacement of any Collateral and/or, at CIT's option, to payment of any of the Obligations in any order or manner as CIT determines.

**6.10**     **Taxes.**  The Company agrees to pay when due all taxes lawfully levied, assessed or imposed upon the Company or the Collateral (including all sales taxes collected by the Company on behalf of the Company's customers in connection with sales of Inventory and all payroll taxes collected by the Company on behalf of the Company's employees), unless the Company is contesting such taxes in good faith, by appropriate proceedings, and is maintaining adequate reserves for such taxes in accordance with GAAP.  Notwithstanding the foregoing, if a lien securing any taxes is filed in any public office, then the Company shall pay all taxes secured by such lien immediately and remove such lien of record promptly.  Pending the payment of such taxes and removal of such lien, CIT may, at its election and without curing or waiving any Event of Default which may have occurred as a result thereof, (i) establish an Availability Reserve in the amount of such taxes (or such other amount as CIT shall deem appropriate in the exercise of its reasonable business judgment) or (ii) pay such taxes on behalf of the Company, and the amount paid by CIT shall become an Obligation which is due and payable on demand by CIT.

**6.11**     **Anti-Money Laundering and Terrorism Regulations.**  The Company: (i) is familiar with all applicable Anti-Terrorism Laws; (ii) acknowledges that its transactions are subject to applicable Anti-Terrorism Laws; (iii) will comply in all material respects with all applicable Anti-Terrorism Laws, including, if appropriate, the USA Patriot Act; (iv) acknowledges that CIT's performance hereunder is also subject to CIT's compliance with all applicable Anti-Terrorism Laws, including the USA Patriot Act; (v) and, to the Company's knowledge, its affiliates are not Blocked Persons; (vi) acknowledges that CIT will not conduct business with any Blocked Person; (vii) will not (a) conduct any business or engage in any transaction or dealing with any Blocked Person, including, without limitation, the making or receiving of any contribution of funds, goods or services to or for the benefit of any Blocked Person, (b) deal in, or otherwise engage in any transaction relating to, any property or interests in property blocked pursuant to Executive Order No. 13224 or other Anti-Terrorism Law, or (c) engage in or conspire to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in Executive Order No. 13224 or other Anti-Terrorism Law; (viii) shall provide to CIT all such information about the Company's ownership, officers, directors, business structure and, to the extent not prohibited by applicable law or agreement, customers, as CIT may reasonably require; and (ix) will take such other action as CIT may reasonably request in connection with its obligations described in clause (iv) above.

**6.12**     **Financial and Other Reporting.**  The Company agrees that it will deliver to CIT: (a) on a timely basis, the financial statements and/or information listed in Section 5.1 of the Schedule; (b) notice of the occurrence of any Default or Event of Default immediately upon knowledge thereof and (c) from time to time, such further information regarding the business affairs and financial condition of the Company as CIT may reasonably request. In addition, should the Company modify its accounting principles and procedures from those in effect on the Effective Date, the Company agrees to prepare and deliver to CIT statements of reconciliation in form and substance reasonably satisfactory to CIT.

**6.13    Negative Covenants.**  The Company agrees not to and will cause the Guarantor and each subsidiary of the Company not to:

**6.13.1    Indebtedness.**  Incur or create any indebtedness, except for (a) current indebtedness maturing in less than one year and incurred in the ordinary course of business for raw materials, supplies, equipment, services, taxes or labor, (b) Subordinated Debt, (c) indebtedness arising this Agreement and (d) any other indebtedness to which CIT has expressly consented in writing.

**6.13.2    Sale of Assets.**  Sell, lease, assign, transfer or otherwise dispose of Collateral, except (a) for sales of Inventory in the ordinary course of business, (b) for a sale pursuant to Section 363 of the Bankruptcy Code, on terms and conditions acceptable to CIT, in its sole discretion, (c) that the Company may make pro rata payments of the Deposit Money to the general unsecured creditors of the Company, and (d) as otherwise specifically permitted by this Agreement.

**6.13.3    Pledge of Assets.**  Mortgage, assign, pledge, transfer or otherwise permit any lien, charge, security interest, encumbrance or judgment (whether as a result of a purchase money or title retention transaction, or other security interest, or otherwise) to exist on any of the Collateral or its other assets, whether now owned or hereafter acquired, except for Permitted Encumbrances.

**6.13.4    Corporate Change.**  Merge, consolidate or otherwise alter or modify its corporate name, principal place of business, structure, or existence, or enter into or engage in any operation or activity materially different from that presently being conducted by the Company, any Guarantor or any subsidiary of the Company, as the case may be.

**6.13.5    Guaranty Obligations.**  Assume, guarantee, endorse, or otherwise become liable upon the obligations of any person, firm, entity or corporation, except pursuant to the Guaranty and by the endorsement of negotiable instruments for deposit or collection or similar transactions in the ordinary course of business;

**6.13.6    Dividends and Distributions.**  Declare or pay any dividend or distributions of any kind on, or purchase, acquire, redeem or retire, any of its equity interests (of any class or type).

**6.13.7    Restricted Payments.**  Make any payment of the principal of, or interest on, any Subordinated Debt, or purchase, acquire or redeem any of the Subordinated Debt, unless (x) such payment, purchase, acquisition or redemption is expressly permitted by the terms of the applicable subordination agreement and (y) no Default or Event of Default shall have occurred and remain outstanding on the date on which such payment or transaction occurs, or would occur as a result thereof.

**6.13.8    Investments.**  (a) create any new subsidiary, or (b) make any advance or loan to, or any investment in, any firm, entity, person or corporation, or (c) acquire all or substantially all of the assets of, or any capital stock or any equity interests in, any firm, entity or corporation, other than current investments of the Company, the Guarantor and any subsidiary of the Company, as the case may be, in existing subsidiaries of such entities.

**6.13.9    Related Party Transactions.**  (a) Enter into any transaction (except with respect to the Subordinated Debt and the Newco Sale, including, without limitation, any purchase, sale, lease, loan or exchange of property, with any shareholder, officer, director, parent (direct or indirect), subsidiary (direct or indirect) or other person or entity otherwise affiliated with the Company, any Guarantor or any subsidiary of the Company, unless (i) such transaction otherwise complies with the provisions of this Agreement, (ii) such transaction is for the sale of goods or services rendered in the ordinary course of business and pursuant to the reasonable requirements of the Company, any Guarantor or any subsidiary of the Company, as the case may be, and upon standard terms and conditions and fair and reasonable terms, no less favorable to such entity than such entity could obtain in a comparable arms length transaction with an unrelated third party, and (iii) no Event of Default shall have occurred and remain outstanding at the time such transaction occurs, or would occur after giving effect to such transaction, or (b) pay any management, consulting or other similar fees to any shareholder, director, parent (direct or indirect), subsidiary (direct or indirect) or other person or entity otherwise affiliated with the Company, any Guarantor or any subsidiary of the Company.

**6.13.10   Chapter 11 Claims.** Incur, create, assume, suffer to exist or permit any administrative expense or claim (whether now existing or hereafter arising, of any kind or nature whatsoever), other than the Carve-Out, which is superior to or pari passu with the liens and security interests granted to CIT by this Agreement and the Loan Documents or the Financing Order.

**6.14   Use of Proceeds and Payments of Expenses and Claims.** No proceeds of any Revolving Loan shall be used to pay administrative or priority costs, fees, expenses or claims under the Bankruptcy Case, except for (i) expenses and claims directly attributable to the business of the Company set forth in the Budget, (ii) payments with respect to the fees and expenses of professionals retained in connection with the Bankruptcy Case where such payment has been authorized by the Bankruptcy Court and this Agreement, and (iii) payments contemplated by the applicable Financing Order.

**6.15   Superpriority Claim Status.** Upon entry of the Financing Order, the Obligations of the Company will constitute allowed administrative expenses in the Bankruptcy Case, having priority in payment over all other administrative expenses and unsecured claims against the Company now existing or hereafter arising, of any kind or nature whatsoever, including without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject, as to priority, only to the Carve-Out and to Permitted Encumbrances having priority of payment over the Obligations to the extent set forth in this Agreement or in the Financing Order.

**6.16   Bankruptcy Case Information.** The Company shall promptly notify CIT of (a) the filing of (and provide CIT with copies of) all operating and other reports and/or financial information provided by the Company to the Bankruptcy Court, the United States Trustee, and any other statutorily appointed or ad hoc committee in the Bankruptcy Case, and copies of all pleadings, motions, applications, judicial information, financial information, and other documents filed by or on behalf of the Company with the Bankruptcy Court in the Bankruptcy Case, or distributed by or on behalf of the Company to any official committee appointed in the Bankruptcy Case, and (b) any application or motion of any Person seeking relief from the automatic stay under Section 362 of the Bankruptcy Code or any other application, motion or pleading filed in the Bankruptcy Case that might result in Default or an Event of Default hereunder.

**6.17   Payments of Bankruptcy Case Fees and Claims.** The Company shall make timely payment of all fees payable to the United States Trustee, if any, in the Bankruptcy Case pursuant to 28 U.S.C. Section 1930 (a)(6). In addition, without prior approval of the Bankruptcy Court and the prior written consent of CIT, the Company shall not make any payment of any proceeds constituting part of the Collateral or other cash (including, without limitation, proceeds of Revolving Loans) to any creditor of the Company on account of claims arising prior to the commencement of the Bankruptcy Case (including, without limitation, payments in respect of reclamation claims of unpaid suppliers of goods delivered to the Company to the commencement of the Bankruptcy Case (regardless of whether such claims have been granted administrative expense priority status pursuant to Section 546(c) of the Bankruptcy Code).

**6.18   No Modification or Stay.** The Company will not, directly or indirectly, seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to either Financing Order, unless CIT has consented to such modification, stay, vacation or amendment in writing, (ii) a priority claim for any administrative expense or unsecured claim (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expenses of the kind specified in the Bankruptcy Code, including Sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the Superpriority Claim of CIT in respect to the Obligations, except for the Carve-Out; or (iii) any lien on any Collateral, having a priority equal or superior to the lien in favor of CIT in respect of the Obligations, except for the Carve-Out and Permitted Encumbrances.

**6.19   Compliance with Applicable Law.** The Bankruptcy Case was commenced on the Filing Date in accordance with applicable law and proper notice thereof and the proper notice under the Bankruptcy Code for each of (a) the motion seeking approval of the Loan Documents and the Interim Financing Order and the Final Order, (b) the hearing for the approval of the Interim Financing Order and (c) the hearing for the approval of the Final Order,

has been or will be given. The Company shall give, on a timely basis as specified in the Financing Order, all notices required to be given to all parties specified in such Financing Order.

6.20    **No Extension**.  The Company shall not request any extension of the period of time within which the Company has exclusive rights to file a plan under Section 1121 of the Bankruptcy Code.

6.21    **Financing Orders**.  The Company covenants and agrees, in each case, unless extended by CIT in its sole discretion, (a) the Interim Financing Order shall be entered no later than January 11, 2010; (b) the Final Order shall be entered no later than January 29, 2010.

6.22    **Asset Purchase Agreement**.  On or before January 29, 2009, the Company and Classic Brands shall enter into an asset purchase agreement ("**Asset Purchase Agreement**") for the sale of all or substantially all of the Company's assets, on terms and conditions satisfactory to CIT in its sole discretion.

6.23    **Factoring Agreements**.  The Factoring Agreements shall remain in full force and effect throughout the term of this Agreement.

6.24    **Existing Term Loan**.  The Company shall continue to make the payments due under the Existing Term Loan in accordance with the terms of the Existing Financing Agreements.

## SECTION 7    POWERS

The Company hereby authorizes CIT, or any person or agent CIT may designate, at the Company's cost and expense, to exercise all of the following powers, which authority shall be irrevocable until termination of this Agreement and the full and final payment and satisfaction of all Obligations: (a) to receive, take, endorse, sign, assign and deliver, all in the name of CIT or the Company, any and all checks, notes, drafts, and other documents or instruments relating to the Collateral; (b) to receive, open and dispose of all mail addressed to the Company and to notify postal authorities to change the address for delivery thereof to such address as CIT may designate; (c) to request from customers indebted on Accounts at any time, in the name of CIT information concerning the amounts owing on the Accounts; (d) to request from customers indebted on Accounts at any time, in the name of the Company, in the name of a certified public accountant designated by CIT or any other designee of CIT, information concerning the amounts owing on the Accounts; (e) to transmit to customers indebted on Accounts notice of CIT's interest therein and to notify customers indebted on Accounts to make payment directly to CIT for the Company's account; and (f) to take or bring, in the name of CIT or the Company, all steps, actions, suits or proceedings deemed by CIT necessary or desirable to enforce or effect collection of the Accounts.  The powers set forth in clauses (b), (c), (e) and (f) of this Section 7 may only be exercised if an Event of Default shall have occurred and remain outstanding.

## SECTION 8    EVENTS OF DEFAULT AND REMEDIES

8.1    **Events of Default.**  Each of the following events shall constitute an "Event of Default":

8.1.1    The failure of the Company to pay any of the Obligations when due;

8.1.2    Cessation of the business of the Company, except as the result of the sale of substantially all of the assets of the Company and the application of the proceeds of such sale to the Obligations;

8.1.3    The failure of the Company to generally meet in the Bankruptcy Case its post-petition debts as they mature;

8.1.4    (a)    the bringing of a motion by the Company or any other Person in the Bankruptcy Case to obtain additional financing under Section 364 of the Bankruptcy Code, to use cash collateral of CIT under Section 363 of the Bankruptcy Code, or to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c), Section 552 of the Bankruptcy Code, or otherwise;

(b)      the Company or any other Person seeks to incur, in a manner inconsistent with this Agreement or the then applicable Financing Order, indebtedness that is secured by a lien with priority equal to or superior to the post-petition liens or which is given super-priority administrative expense status under Bankruptcy Code Section 364(c)(i);

(c)      notice is given of a sale under Section 363 of the Bankruptcy Code of all or part of the post-petition Collateral as to which CIT is not proposed to be paid in full or with respect to which CIT has not provided its prior written consent;

(d)      the Bankruptcy Court shall enter an order granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on any Collateral, or (ii) with respect to any lien of, or the granting of any lien on, any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a material adverse effect on (A) the Company's ability to repay the Obligations hereunder in accordance with the terms hereof or (B) the Collateral or CIT's liens granted hereunder on the Collateral or the priority of a material portion of such liens;

(e)      an order is entered by the Bankruptcy Court appointing, or the Company or any other Person files an application for an order seeking the appointment of, without the prior written consent of CIT, an examiner with enlarged powers relating to the execution of the business (i.e., powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

(f)      an order is entered by the Bankruptcy Court, without the prior written consent of CIT, (A) permitting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Company equal or superior to the priority of CIT with respect to the Obligations, except for the Carve-Out, or (B) granting or permitting the granting of a lien on the Collateral other than a Permitted Encumbrance;

(g)      the Company fails to file in the Bankruptcy Case a plan of reorganization containing a provision for termination of this Agreement and the indefeasible repayment in full, in cash of the Obligations of the Company within the exclusivity period provided in Section 1121 of the Bankruptcy Code, or seeks an extension of such exclusivity period without the prior written consent of CIT, or otherwise fails to provide for the indefeasible payment in full , in cash, of the Obligations;

(h)      an order is entered by the Bankruptcy Court confirming a plan of reorganization in the Bankruptcy Case which does not (i) contain a provision for termination of this Agreement and the indefeasible payment in full in cash of all Obligations of the Company under this Agreement and the other Loan Documents on or before the effective date of such plan or plans, and (ii) provide for the continuation of the liens and security interests granted to CIT (and maintains the priorities of such liens and security interests) until such plan effective date, unless the Obligations have been indefeasibly paid in full, in cash, and this Agreement and all other Loan Documents have been terminated;

(i)      any Person shall attempt to invalidate, reduce or otherwise impair the liens or security interests of CIT, or any claims or rights against such Person, or to subject any of the Collateral to assessment pursuant to Section 506(c), 552(b), or otherwise, of the Bankruptcy Code, or pursuant to other applicable law;

(j)      any lien or security interest created by this Agreement or the Financing Order shall, for any reason, cease to be valid;

(k)      any action is commenced which contests any provision of any Financing Order, or the validity, perfection, priority or enforceability of any of the liens and security interests of CIT;

(l)      the Bankruptcy Case is dismissed, or is converted to a case under chapter 7 of the Bankruptcy Code or a chapter 11 trustee is appointed,

(m)    the Company shall fail to comply with or perform any of the terms or conditions of the then applicable Financing Order.

**8.1.5**    The Bankruptcy Court shall enter any order (i) suspending, superseding, revoking, reversing, staying, vacating, rescinding, modifying, supplementing or otherwise amending either the Financing Order, this Agreement or any other Loan Document (except as otherwise approved by CIT in writing), or (ii) to grant or permit the grant of a lien on the Collateral other than Permitted Encumbrances;

**8.1.6**    The breach by the Company of any warranty, representation or covenant contained in this Agreement;

**8.1.7**    The occurrence of any default or event of default (after giving effect to any applicable grace or cure period) under any of the other Loan Documents, or any of the other Loan Documents ceases to be valid, binding and enforceable in accordance with its terms;

**8.1.8**    The Company shall (i) engage in any "prohibited transaction" as defined in ERISA, (ii) incur any "accumulated funding deficiency" as defined in ERISA, (iii) incur any "reportable event" as defined in ERISA, (iv) terminate any "plan", as defined in ERISA or (v) become involved in any proceeding in which the Pension Benefit Guaranty Corporation shall seek appointment, or is appointed, as trustee or administrator of any "plan", as defined in ERISA, and with respect this <u>subsection 8.1.7</u>, such event or condition either (x) remains uncured for a period of thirty (30) days from date of occurrence and (y) could, in CIT's reasonable business judgment, subject the Company to any tax, penalty or other liability having a material adverse effect on the Company;

**8.1.9**    (a) The failure of Michael Zipelli to remain actively engaged in the management of the Company (other than by reason of death or permanent disability), or (b) the sale, assignment or other transfer of capital stock in the Company, or any voting rights associated therewith, without the prior written consent of CIT;

**8.1.10**    A final judgment for the payment of money in excess of $25,000 shall be rendered against the Company or any Guarantor;

**8.1.11**    The occurrence of any default or event of default (after giving effect to any applicable grace or cure periods) under any instrument or agreement evidencing or governing (x) Subordinated Debt or (y) any other indebtedness of the Company having a principal amount in excess of $50,000;

**8.1.12**    The Company shall modify the terms or provisions of any agreement, instrument or other document relating to any Subordinated Debt without CIT's prior written consent or make any payment, purchase, acquire or redeem of any Subordinated Debt which is not expressly not permitted by the terms of the subordination agreement with respect to such Subordinated Debt in favor of CIT;

**8.1.13**    The entry of an order in the Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owning under this Agreement or the other Loan Documents;

**8.1.14**    The failure of the Company to perform, keep, or observe any of the covenants, conditions, premises, agreements or obligations of the Company under the applicable Financing Order.

**8.1.15**    Any Guarantor shall attempt to terminate its Guaranty or deny that such Guarantor has any liability thereunder, or such Guaranty shall be declared null and void and of no further force and effect.

**8.2**    <u>Remedies With Respect to Outstanding Obligations</u>.  Upon the occurrence of a Default or an Event of Default, at the option of CIT, all loans, advances and extensions of credit provided for in <u>Section 2</u> hereof shall be thereafter made in CIT's sole discretion, and the obligation of CIT to make Revolving Loans, shall cease unless such Default is cured to CIT's satisfaction or such Event of Default is waived in accordance herewith.  In addition, upon the occurrence of an Event of Default, CIT may, at its option (a) declare all Obligations immediately due and payable, (b) charge the Company the default rate of interest on all then outstanding or thereafter incurred Obligations in lieu of the interest provided for in <u>Section 3.1.3</u> hereof, and (c) immediately terminate this Agreement upon notice to the Company.   Notwithstanding the foregoing, (x) CIT's commitment to make loans, advances and

extensions of credit provided for in <u>Section 2</u> hereof automatically shall terminate without any declaration, notice or demand by CIT upon the commencement of any proceeding described in <u>Sections 8.1.4 or 8.1.5</u> hereof, and (y) this Agreement automatically shall terminate and all Obligations shall become due and payable immediately without any declaration, notice or demand by CIT, upon the commencement of any proceeding or order described in <u>Section 8.1.4 or 8.1.5</u>. The exercise of any option is not exclusive of any other option that may be exercised at any time by CIT.

**8.3** **Remedies With Respect to Collateral.** Immediately after the occurrence of an Event of Default and the notice required under the then applicable Financing Order, CIT may, at its option, to the extent permitted by applicable law: (a) remove from any premises where same may be located any and all books and records, computers, electronic media and software programs associated with any Collateral (including electronic records, contracts and signatures pertaining thereto), documents, instruments and files, and any receptacles or cabinets containing same, relating to the Accounts, and CIT may use, at the Company's expense, such of the Company's personnel, supplies or space at the Company's places of business or otherwise, as may be necessary to properly administer and control the Accounts or the handling of collections and realizations thereon; (b) bring suit, in the name of the Company or CIT, and generally shall have all other rights respecting the Accounts, including, without limitation, the right to (i) accelerate or extend the time of payment, (ii) settle, compromise, release in whole or in part any amounts owing on any Accounts and (iii) issue credits in the name of the Company or CIT; (c) sell, assign and deliver the Collateral and any returned, reclaimed or repossessed merchandise, with or without advertisement, at public or private sale, for cash, on credit or otherwise, at CIT's sole option and discretion, and CIT may bid or become a purchaser at any such sale, free from any right of redemption, which right is hereby expressly waived by the Company; (d) foreclose CIT's security interests in the Collateral by any available judicial procedure, or take possession of any or all of the Collateral without judicial process, and to enter any premises where any Collateral may be located for the purpose of taking possession of or removing the same; and (e) exercise any other rights and remedies provided in law, in equity, by contract or otherwise. CIT shall have the right, without notice or advertisement, to sell, lease, or otherwise dispose of all or any part of the Collateral whether in its then condition or after further preparation or processing, in the name of the Company or CIT, or in the name of such other party as CIT may designate, either at public or private sale or at any broker's board, in lots or in bulk, for cash or for credit, with or without warranties or representations (including, without limitation, warranties of title, possession, quiet enjoyment and the like), and upon such other terms and conditions as CIT in its sole discretion may deem advisable, and CIT shall have the right to purchase at any such sale. If any Inventory and Equipment shall require rebuilding, repairing, maintenance or preparation, CIT shall have the right, at its option, to do such of the aforesaid as is necessary, for the purpose of putting the Inventory and Equipment in such saleable form as CIT shall deem appropriate. The Company agrees, at the request of CIT, to assemble the Inventory and Equipment, and to make it available to CIT at premises of the Company or elsewhere and to make available to CIT the premises and facilities of the Company for the purpose of CIT's taking possession of, removing or putting the Inventory and Equipment in saleable form. If notice of intended disposition of any Collateral is required by law, it is agreed that ten (10) days notice shall constitute reasonable notification and full compliance with the law. The net cash proceeds resulting from CIT's exercise of any of the foregoing rights (after deducting all Out-of-Pocket Expenses relating thereto) shall be applied by CIT to the payment of the Obligations, whether due or to become due, in such order as CIT may elect, and the Company shall remain liable to CIT for any deficiencies, and CIT in turn agrees to remit to the Company or its successors or assigns, any surplus resulting therefrom. The enumeration of the foregoing rights is not intended to be exhaustive and the exercise of any right shall not preclude the exercise of any other right of CIT under applicable law or the other Loan Documents, all of which shall be cumulative.

## SECTION 9   TERMINATION

This Agreement shall terminate as of the DIP Revolver Maturity Date or, at the option of CIT (but subject to Section 8.2), upon the occurrence of an Event of Default. All Obligations shall become due and payable in full on the date of any termination hereunder. Pending a final accounting of the Obligations, unless supplied with an indemnity satisfactory to CIT, the Company shall pay to CIT in immediately available funds, or CIT may withhold any credit balances in the Revolving Loan Account as a cash reserve, an amount sufficient to cover any contingent Obligation then outstanding. All of CIT's rights, liens and security interests granted pursuant to the Loan Documents shall continue after any termination of this Agreement until all Obligations have been fully and finally paid and satisfied.

**SECTION 10    GENERAL INDEMNITY**

In addition to the Company's agreement to reimburse CIT for Out-of-Pocket Expenses, but without duplication, the Company hereby agrees to indemnify CIT and its officers, directors, employees, attorneys and agents (each, an "Indemnified Party") from, and to defend and hold each Indemnified Party harmless against, any and all losses, liabilities, obligations, claims, actions, judgments, suits, damages, penalties, costs, fees, expenses (including reasonable attorney's fees) of any kind or nature which at any time may be imposed on, incurred by, or asserted against, any Indemnified Party:

(a)      as a result of CIT's exercise of (or failure to exercise) any of CIT's rights and remedies hereunder, including, without limitation, (i) any sale or transfer of the Collateral, (ii) the preservation, repair, maintenance, preparation for sale or securing of any Collateral, and (iii) the defense of CIT's interests in the Collateral (including the defense of claims brought by the Company, as a debtor-in-possession or otherwise, any secured or unsecured creditors of the Company, or any trustee or receiver in bankruptcy);

(b)      as a result of any environmental pollution, hazardous material or environmental clean-up relating to the Real Estate, the Company's operation and use of the Real Estate, and the Company's off-site disposal practices;

(c)      arising from or relating to (i) the maintenance and operation of any Depository Account, (ii) any agreement or document relating to any Depository Account to which any Indemnified Party is party and (iii) any action taken (or failure to act) by any Indemnified Party with respect thereto;

(d)      [Reserved];

(e)      in connection with any regulatory investigation or proceeding by any regulatory authority or agency having jurisdiction over the Company; and

(f)      otherwise relating to or arising out of the transactions contemplated by this Agreement and the other Loan Documents, or any action taken (or failure to act) by any Indemnified Party with respect thereto;

provided that an Indemnified Party's conduct in connection with the any of the foregoing matters does not constitute gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction. This indemnification shall survive the termination of this Agreement and the payment and satisfaction of the Obligations. CIT may from time to time establish Availability Reserves with respect to this indemnity as CIT may deem advisable in the exercise of its reasonable business judgment, and upon termination of this Agreement, CIT may hold such reserves as cash reserves as security for this indemnity.

**SECTION 11    MISCELLANEOUS**

**11.1    Waivers.** The Company hereby waives diligence, demand, presentment, protest and any notices thereof as well as notices of nonpayment, intent to accelerate and acceleration. No waiver of an Event of Default by CIT shall be effective unless such waiver is in writing and signed by CIT. No delay or failure of CIT to exercise any right or remedy hereunder, whether before or after the happening of any Event of Default, shall impair any such right or remedy, or shall operate as a waiver of such right or remedy, or as a waiver of such Event of Default. A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. No single or partial exercise by CIT of any right or remedy precludes any other or further exercise thereof, or precludes any other right or remedy.

**11.2    Entire Agreement; Amendments; Sale of Interest.**

(a)      This Agreement and the other Loan Documents: (a) constitute the entire agreement between the Company and CIT; (b) supersede any prior agreements (including the agreements set forth in any commitment letter); (c) may be amended only by a writing signed by the Company and CIT; and (d) shall bind and benefit the Company and CIT and their respective successors and assigns, except that the Company shall not have the right to

assign (by operation of law or otherwise) its rights or obligations hereunder without the prior written consent of CIT. Should the provisions of any other Loan Document conflict with the provisions of this Agreement, the provisions of this Agreement shall apply and govern.

(b)    The Company hereby consents to CIT's participation, sale, assignment, transfer, pledge, encumbrance or other disposition, at any time or times hereafter, of this Agreement and any of the other Loan Documents, or of any portion hereof or thereof, including, without limitation, CIT's rights, title, interests, remedies, powers, and duties hereunder or thereunder. Any partial assignment shall be made as an assignment of a ratable portion of CIT's interest therein, except that CIT may assign all or a portion of its rights, title, interests, remedies, powers, and duties under this Agreement or under any of the other Loan Documents among separate tranches or different types of loans on a non-pro rata basis. In the case of an assignment, the assignee shall have, to the extent of such assignment, the same rights, benefits and obligations as it would if it were "CIT" hereunder, and CIT shall be relieved, to the extent of any such assignment, of all obligations hereunder upon any such assignment. CIT shall maintain a register of the names and addresses of all assignees, which shall include the commitments of, and the amount of loans outstanding to, such assignees. The Company agrees that it will use its best efforts to assist and cooperate with CIT in any manner reasonably requested by CIT to effect the sale of participations in or assignments of any of the Loan Documents or any portion thereof or interest therein, including, without limitation, assisting in the preparation of appropriate disclosure documents. The Company further agrees that CIT may disclose credit information regarding the Company and its affiliates to any potential participant or assignee.

**11.3    Usury Limit.**    In no event shall the Company, upon demand by CIT for payment of any indebtedness relating hereto, by acceleration of the maturity thereof, or otherwise, be obligated to pay interest and fees in excess of the amount permitted by law. Regardless of any provision herein or in any agreement made in connection herewith, CIT shall never be entitled to receive, charge or apply, as interest on any indebtedness relating hereto, any amount in excess of the maximum amount of interest permissible under applicable law. If CIT ever receives, collects or applies any such excess, it shall be deemed a partial repayment of principal and treated as such. If as a result, the entire principal amount of the Obligations is paid in full, any remaining excess shall be refunded to the Company. This Section 11.3 shall control every other provision of the Agreement, the other Loan Documents and any other agreement made in connection herewith.

**11.4    Severability.**    If any provision hereof or of any other Loan Document is held to be illegal or unenforceable, such provision shall be fully severable, and the remaining provisions of the applicable agreement shall remain in full force and effect and shall not be affected by such provision's severance. Furthermore, in lieu of any such provision, there shall be added automatically as a part of the applicable agreement a legal and enforceable provision as similar in terms to the severed provision as may be possible.

**11.5    WAIVER OF JURY TRIAL; JUDICIAL REFERENCE; SERVICE OF PROCESS.**

(a)    TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE COMPANY AND CIT EACH HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREUNDER.

(b)    THE COMPANY HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF PROCESS AND CONSENTS TO SERVICE OF PROCESS BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED. IN NO EVENT WILL CIT BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES.

(c)    IF (I) THE BANKRUPTCY CASE IS DISMISSED, (II) THE BANKRUPTCY COURT ABSTAINS FROM HEARING ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO) OR (III) THE BANKRUPTCY COURT REFUSES TO EXERCISE JURISDICTION OVER ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (OR IN

ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO), THEN ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENT, THE OTHER LOAN DOCUMENTS OR THE COLLATERAL SHALL BE LITIGATED IN COURTS \HAVING SITUS WITHIN THE CITY OF NEW YORK, STATE OF NEW YORK. THE COMPANY HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE.   THE COMPANY HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST THE COMPANY BY CIT IN ACCORDANCE WITH THIS SECTION.

**11.6**    <u>Notices.</u>  Except as otherwise herein provided, any notice or other communication required hereunder shall be in writing (messages sent by e-mail or other electronic transmission (other than by telecopier) shall not constitute a writing, however any signature on a document or other writing that is transmitted by e-mail or telecopier shall constitute a valid signature for purposes hereof), and shall be deemed to have been validly served, given or delivered when received by the recipient if hand delivered, sent by commercial overnight courier or sent by facsimile, or three (3) Business Days after deposit in the United States mail, with proper first class postage prepaid and addressed to the party to be notified as follows:

|     |     |     |
| --- | --- | --- |
| (a) | <u>if to CIT</u>, at: | The CIT Group/Commercial Services, Inc. <br> 11 West 42nd Street <br> New York, New York  10036 <br> Attn:  Credit Officer – Classic Sleep Products <br> Fax No.:  (212) 461-5347 |
|     | <u>With a copy to:</u> | Stradley Ronon Stevens & Young, LLP <br> Woodland Falls Corporate Park <br> 200 Lake Drive East, Suite 100 <br> Cherry Hill, New Jersey  08002 <br> Attn:  Michael P. Bonner, Esquire <br> Fax No.:  (856) 321-2415 |
| (b) | <u>if to the Company</u>, at: | Classic Sleep Products, Inc <br> 8214 Wellmoor Court <br> Jessup, Maryland  20794 <br> Attn:  Michael Zipelli, President <br> Fax No.:  (443) 836-2399 |
|     | With a copy to: | Shulman, Rogers, Gandal, Pordy & Ecker, P.A. <br> 12505 Park Potomac Avenue, 6th Floor <br> Potomac, Maryland  20854 <br> Attn:  Michael J. Lichtenstein, Esquire <br> Fax: (301) 230-2891 |

(c)    to such other address as any party may designate for itself by like notice.

**11.7**    <u>Counterparts; Electronic Execution.</u>  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by telefacsimile or by electronic transmission in "pdf" or other imaging format shall be equally as effective as delivery of an original executed counterpart of this Agreement.  Any party delivering an executed counterpart of this Agreement by telefacsimile or electronic transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability and binding effect of this Agreement.

**11.8    CHOICE OF LAW.    THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ITS CONFLICTS OF LAWS PROVISIONS), EXCEPT TO THE EXTENT THAT ANY OTHER LOAN DOCUMENT INCLUDES AN EXPRESS ELECTION TO BE GOVERNED BY THE LAWS OF ANOTHER JURISDICTION.**

11.9    In the event of any inconsistency between this Agreement and any of the Loan Documents, this Agreement shall control.


[Signatures on Next Page]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and effective by their proper and duly authorized officers as of the date set forth above.

**CLASSIC SLEEP PRODUCTS, INC.**            **THE CIT GROUP/COMMERCIAL SERVICES, INC.**

By:_____            By:_____
Name:   Michael Zipelli                          Name:
Title:    Chief Executive Officer and President   Title:

## SCHEDULE TO FINANCING AGREEMENT
## BETWEEN
## CLASSIC SLEEP PRODUCTS, INC.
## AND
## THE CIT GROUP/COMMERCIAL SERVICES, INC.

### SECTION 1  COMPANY INFORMATION

(a)  **Name of Company:**                                    Classic Sleep Products, Inc.

(b)  **Type of Entity and State of**                         A corporation, incorporated under the laws of Delaware
     **Incorporation/Formation:**

(c)  **Federal Employer ID #:**                              52-2262022

(d)  **State Organization # (if any):**                      3266251

(e)  **Chief Executive Office Address:**                     8214 Wellmoor Court, Jessup, Maryland  20794

(g)  **Subsidiaries**                                        None

(h)  **Existing Liens:**                                     (a) so long as the Factoring Agreements have not been terminated
                                                             and the Factor's lien on the Accounts shall not have been released, a
                                                             first lien on Accounts of the Company in favor of the Factor in
                                                             connection with the Factoring Agreements, and (b) liens in favor of
                                                             JMX Capital Partners, so long as such liens are junior and
                                                             subordinate to the liens in favor of CIT pursuant to a subordination
                                                             agreement in form and substance satisfactory to CIT.

(i)  **Collateral Locations**                                8214 Wellmoor Court, Jessup, Maryland  20794

### SECTION 2  FINANCIAL COMMITMENTS

**2.1 Revolving Credit Limit:**                              $5,500,000

**2.2 Borrowing Base:**                                      At any time, an amount equal to the sum at such time of:

                                                             (a) 85% of the outstanding Eligible Accounts, provided, however,
                                                             that if the Dilution Percentage is greater than five percent (5%),
                                                             then the rate of advance hereunder shall be reduced by one
                                                             percentage point for each percentage point (or fraction thereof) that
                                                             the Dilution Percentage is greater than five percent (5%); plus

                                                             (b) the least of (i) 60% of the aggregate value of Eligible Inventory
                                                             consisting of finished goods or raw materials and Eligible In-Transit
                                                             Inventory, valued at the lower of cost or market on a first in, first

out basis, (ii) 85% of the net orderly liquidation value of Eligible Inventory and Eligible In-Transit Inventory as determined by the most recent appraisal of the Company's Inventory by an appraiser selected by CIT, or (iii) $3,000,000; provided, however, that (A) aggregate outstanding advances against Inventory consisting of raw materials shall not exceed $850,000 at any time, and (B) aggregate outstanding advances against Eligible In-Transit Inventory shall not exceed $650,000 at any time; minus

(c) the amount of the Availability Reserve in effect at such time.

**2.3 Additional Availability Reserves:**

A reserve equal to (i) three (3) months rental payments or similar charges for any of the Company's leased premises or other Collateral locations, and (ii) three (3) months estimated payments (plus any other fees or charges owing by the Company) to any applicable warehousemen or third party processor (as determined by CIT in the exercise of its reasonable business judgment), provided that any of the foregoing amounts shall be adjusted from time to time hereafter upon delivery to CIT of an acceptable waiver agreement.

## SECTION 3 INTEREST, FEES AND EXPENSES

**3.1 Interest Rate:**

The Base Rate plus one and one-half of one percent (1.50%) per annum

**3.2 Loan Facility Fee:**

$25,000, fully earned and payable on the Effective Date

**3.3 Line of Credit Fee:**

One-quarter of one-percent (0.25%) per annum

## SECTION 4 COLLATERAL

**4.1 Real Estate Collateral:**

N/A

**4.2 Collateral Reporting:**

See Annex A attached hereto.

## SECTION 5 REPRESENTATIONS, WARRANTIES AND COVENANTS

**5.1 Financial Reporting:**

(a) within ninety (90) days after the end of each fiscal year of the Company, a balance sheet as at the close of such year, and statements of profit and loss and cash flow of the Company and its subsidiaries for such year, prepared in accordance with GAAP and reviewed by independent public accountants selected by the Company and satisfactory to CIT, together with an officer's certificate substantially in the form set forth on Annex B attached hereto, signed by the treasurer or chief financial officer of the Company;

(b) within thirty (30) days after the end of each month, (i) a balance sheet as at the end of such month, (ii) statements of profit and loss and cash flow of the Company and its subsidiaries for such month and for the period commencing on the first day of the current fiscal

2

year through the end of such month, (iii) comparative statements of profit and loss and cash flow of the Company and its subsidiaries for the same month and same fiscal year-to-date period in the prior fiscal year, prepared in accordance with GAAP and certified by the treasurer or chief financial officer of the Company (or any other authorized officer satisfactory to CIT), and (iv) an officer's certificate substantially in the form set forth on Annex B attached hereto, signed by the treasurer or chief financial officer of the Company;

(c) as and when filed by the Company, copies of all (i) financial reports, registration statements and other documents filed by the Company with the U.S. Securities and Exchange Commission, as and when filed by the Company, and (ii) upon CIT's request, annual reports filed pursuant to ERISA in connection with each benefit plan of the Company subject to ERISA; and

(d) no later than thirty (30) days prior to the beginning of each fiscal year of the Company, monthly projections of the Company's consolidated balance sheet and consolidating balance sheet, and consolidated/consolidated and consolidating statements of profits and loss and cash flow of the Company, prepared in accordance with GAAP, as well as monthly projected Availability for the Company for such fiscal year.

## SECTION 6: TERMINATION

**6.1**    DIP Revolver Maturity Date:    The earlier to occur of (a) the date of entry of an order confirming a plan or reorganization, or (b) February 26, 2010.

**ANNEX A – Collateral Reporting Provisions**

**A.**     The Company agrees to furnish to CIT:

(1)     At least once each week (but more frequently upon CIT's request), a borrowing base certificate in form and substance satisfactory to CIT, including weekly updates of Eligible Accounts and ineligible Accounts, certified by the treasurer or chief financial officer of the Company (or any other authorized officer satisfactory to CIT), together with such confirmatory schedules of Trade Accounts and Inventory (in form and substance satisfactory to CIT) as CIT reasonably may request.  CIT, in its sole discretion, may permit the Company to access CIT's System for the purpose (in addition to those set forth in Section 2.1.7 of the Agreement) of completing and submitting borrowing base certificates when required hereunder.

(2)     At least once each week (but more frequently upon CIT's request) a comparison of actual disbursements to those reflected for the prior week as well as on a cumulative basis through the end of the prior week.

(3)     At least once each week (but more frequently upon CIT's request), a comparative statement of the Company's actual results compared to the Budget for the preceding week and for the cumulative period.

(4)     On or before the 15th day of each month (but more frequently upon CIT's reasonable request), a summary of Inventory (containing such detail from the Company's perpetual inventory as CIT may require) as of the last day of the preceding month, together with information sufficient to allow CIT to update the amount of ineligible Inventory.

(5)     On or before the 15th day of each month (but more frequently upon CIT's reasonable request), a detailed and summary aging report of Trade Accounts existing as of the last day of the preceding month and a roll-forward of Trade Accounts from the first day of the preceding month through the last day of the preceding month, all in such form as CIT reasonably shall require, certified by the treasurer or the chief financial officer of the Company (or any other authorized officer satisfactory to CIT), together with (x) a reconciliation, as of the last day of the preceding month, of the Company's Trade Accounts aging report to the Company's general ledger, and (y) if required by CIT, such other information sufficient to allow CIT to (A) reconcile, as of the date of such report, the Company's Trade Accounts aging report to the applicable borrowing base certificate delivered by the Company to CIT and (B) update the amount of Eligible Accounts, Eligible In-Transit Inventory and Eligible Inventory.

(6)     On or before the 15th day of each month (but more frequently upon CIT's reasonable request), an aged trial balance of all the Company's accounts payable as of the last day of the preceding month.

(7)     Prompt written disclosure of (x) all matters adversely affecting the value, enforceability or collectability of the Trade Accounts of the Company, (y) all customer disputes, offsets, defenses, counterclaims, returns, rejections and all reclaimed or repossessed merchandise or goods, and (z) all matters adversely affecting the value or marketability of the Inventory, all in such detail and format as CIT reasonably may require, provided that to the extent that any such matter would not have a material adverse effect on the Company, the Company may disclose such matter to CIT when the Company provides CIT with the borrowing base certificate described in clause (1) above.

(8)     Prior written notice of any change in the location of any Collateral and any material change in type, quantity, quality or mix of the Inventory.

(9)     From time to time, access to the Company's computers, electronic media, software programs (including any electronic records, contracts and signatures) and such other documentation and information relating to the Trade Accounts, Inventory and other Collateral as CIT reasonably may require.

**B.**      The Company may deliver to CIT any borrowing base certificate, collateral report or other material that the Company is required to deliver to CIT under clauses (1), (2) and (3) of <u>Section A of this Annex A</u> by e-mail or other electronic transmission (an "<u>Electronic Transmission</u>"), subject to the following terms:

      (1)      Each Electronic Transmission must be sent by the treasurer or chief financial officer of the Company (or any other authorized officer satisfactory to CIT), and must be addressed to the loan officer and the collateral analyst of CIT that handle the Company's account, as designated by CIT from time to time.  If any Electronic Transmission is returned to the sender as undeliverable, the material included in such Electronic Transmission must be delivered to the intended recipient in the manner required by <u>Section 11.6 of the Agreement</u>.

      (2)      Each certificate, collateral report or other material contained in an Electronic Transmission must be in a "pdf" or other imaging format and, to the extent that such material must be certified by an officer of the Company under this <u>Annex A</u>, must contain the signature of the officer submitting the Electronic Transmission.  As provided in <u>Section 11.6</u>, any signature on a certificate, collateral report or other material contained in an Electronic Transmission shall constitute a valid signature for purposes hereof.  CIT may rely upon, and assume the authenticity of, any such signature, and any material containing such signature shall constitute an "authenticated" record for purposes of the Uniform Commercial Code and shall satisfy the requirements of any applicable statute of frauds.

      (3)      The Company agrees to maintain the original versions of all certificates, collateral reports and other materials delivered to CIT by means of an Electronic Transmission and agrees to furnish to CIT such original versions within five (5) Business Days of CIT's request for such materials, signed and certified (to the extent required hereunder) by the officer submitting the Electronic Transmission.

**C.**      The Company hereby authorizes CIT to regard the Company's printed name or rubber stamp signature on assignment schedules or invoices as the equivalent of a manual signature by one of the Company's authorized officers or agents.  The Company's failure to promptly deliver to CIT any schedule, report, statement or other information set forth in this <u>Annex A</u> shall not affect, diminish, modify or otherwise limit CIT's security interests in the Collateral.

**ANNEX B**
**FORM OF COMPLIANCE CERTIFICATE**

[Date]

The CIT Group/Commercial Services, Inc.
11 West 42nd Street, 11th Floor
New York, New York 10036

RE:    DIP Credit Agreement dated as of January ___, 2010 (as amended, the **"Credit Agreement"**) among The CIT Group/Commercial Services, Inc. (**"CIT"**), and Classic Sleep Products, Inc. (the **"Company"**)

Ladies and Gentlemen:

Reference is made to the Credit Agreement. Capitalized terms used herein and not specifically defined shall have the meanings given to such terms in the Credit Agreement.

Pursuant to Sections 4.4 and 6.12 of the Credit Agreement, I enclose: (a) the Company's financial statements for the month ended _____, 200__ (the **"Reporting Month"**) and the fiscal year-to-date period ended _____, 200__; and (b) a borrowing base certificate as of the last day of the Reporting Month, together with a detailed and summary aging report of Trade Accounts existing as of the last day of the Reporting Month and a roll-forward of Trade Accounts from the first day of the Reporting Month through the last day of the Reporting Month.

As the _____ of the Company, I hereby certify to CIT that: (a) the financial statement(s) fairly and accurately represent the Company's financial condition at the end of the particular accounting periods covered by such financial statements, as well as the Company's operating results during such accounting periods, subject to year-end accountant reviewed adjustments; (b) the borrowing base is true, correct, and based on information contained in the Company's own financial accounting records; (c) during the Reporting Month, (i) to my knowledge, there has occurred no Default or Event of Default under the Credit Agreement, or, if I have knowledge that any Default or Event of Default has occurred during such period, a detailed description thereof is set forth on the Exhibit __ attached hereto, (ii) the Company has not received any notice of cancellation with respect to its property insurance policies, and (iii) all invoices, charges, fees or other payments due to landlords, warehousemen, or other third party service providers due during such Reporting Month have been paid; and (d) Exhibit __ attached hereto sets forth detailed calculations showing compliance with all financial covenants contained in the Credit Agreement, for the periods of measurement covered by or ending on the last day of the Reporting Month.

Very truly yours,

**[attach appropriate exhibits]**

**EXHIBIT A**

THE BUDGET

1/4/2010

**Classic Sleep Products, Inc.**
Weekly Cash Flow Projection

| | 2010 | | | | | | | CLASSIC NEW YEAR | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget | Budget |
| | 1/2 | 1/9 | 1/16 | 1/23 | 1/30 | 2/6 | 2/13 | 2/20 | 2/27 | 3/6 | 3/13 | 3/20 | | | | |
| | 1/8 | 1/15 | 1/22 | 1/29 | 2/5 | 2/12 | 2/19 | 2/26 | 3/5 | 3/12 | 3/19 | 3/26 | | | | |
| **BEGINNING CASH BALANCE** | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | | | | |
| **CASH INFLOW** | | | | | | | | | | | | | | | | |
| Advances from CIT | 469,596 | 779,863 | 700,263 | 779,648 | 557,195 | 221,645 | 243,224 | 269,224 | 221,478 | 210,931 | 686,689 | 706,049 | 628,138 | 509,120 | 469,046 | |
| Other receipts (net) | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | |
| Other | | | | | | | | | | | | | | | | |
| **Total Cash Inflow** | 489,596 | 799,863 | 720,263 | 799,648 | 577,195 | 241,645 | 269,224 | 289,224 | 241,478 | 230,931 | 706,689 | 726,049 | 648,138 | 529,120 | 489,046 | |
| **NET CURRENT AVAIL BAL** | 496,306 | 806,571 | 726,971 | 806,356 | 583,902 | 248,353 | 275,931 | 295,931 | 248,185 | 237,638 | 713,397 | 732,757 | 654,846 | 535,828 | 495,756 | |
| **PROJECTED CASH OUTFLOW** | | | | | | | | | | | | | | | | |
| **PAYROLL RELATED** | | | | | | | | | | | | | | | | |
| Payroll Gross | 55,001 | 55,002 | 55,003 | 55,004 | 55,005 | 55,000 | 55,007 | 55,006 | 55,008 | 55,009 | 55,010 | 55,011 | 55,011 | 55,012 | | |
| HSA / HRA contributions | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 600 | 850 | 850 | 690 | 600 | 600 | | |
| Sales Commissions | 20,000 | 31,395 | | | 20,000 | | 31,395 | | | | 31,395 | | 31,395 | | | |
| **Total Payroll Related Category** | 75,601 | 86,997 | 55,603 | 55,604 | 75,605 | 55,606 | 87,002 | 55,606 | 55,608 | 75,609 | 55,610 | 55,610 | 87,006 | 55,612 | | |
| **NET AVAIL BAL AFTER PAYROLL** | 420,704 | 719,673 | 671,366 | 750,751 | 508,297 | 192,747 | 188,929 | 192,575 | 192,577 | 162,029 | 657,787 | 677,239 | 447,839 | 480,144 | | |
| **A/P DISBURSEMENT** | | | | | | | | | | | | | | | | |
| Materials | 334,727 | 632,225 | 588,819 | 678,856 | 417,249 | 104,308 | 127,280 | 120,860 | 120,880 | 69,830 | 472,132 | 385,383 | 359,269 | | | |
| Transp - In | 17,524 | 17,524 | 17,524 | 17,524 | 17,524 | 17,524 | 17,524 | 17,524 | 17,524 | 17,524 | 17,524 | 17,524 | 17,524 | | | |
| Transp - Out | 17,380 | 24,800 | 24,800 | 24,800 | 24,800 | 24,800 | 24,800 | 24,800 | 24,800 | 24,850 | 24,850 | 24,900 | 24,800 | | | |
| Overhead | 7,317 | 5,217 | 11,417 | 7,317 | 5,217 | 5,417 | 11,217 | 7,317 | 7,317 | 5,417 | 5,423 | 11,217 | 7,517 | | | |
| Occupancy | 34,500 | 32,000 | | 340 | 34,700 | 32,000 | 280 | 140 | 34,700 | 32,200 | | 140 | | | | |
| Services | 1,000 | 1,000 | 1,900 | 55,000 | 1,000 | 1,900 | 1,000 | 15,500 | 1,000 | 101,000 | 1,000 | | 10,000 | | | |
| Misc. | 1,218 | 200 | 200 | 206 | 1,100 | 200 | 206 | 208 | 1,100 | 200 | 206 | | | | | |
| Interest, Fees, etc. | | | | | | | | | | | | | | | | |
| Factoring Fees | 1,843 | 4,339 | 4,143 | 5,068 | 1,946 | 1,629 | 2,026 | 1,905 | 1,905 | 22,000 | 3,474 | 3,173 | 5,173 | 3,352 | | |
| DIP / Inter-loan payment | | | | | | | | | | 2,163 | | | | | | |
| **Total Weekly Disbursement $** | 413,997 | 712,866 | 664,668 | 744,044 | 501,590 | 186,039 | 182,322 | 185,888 | 185,888 | 155,322 | 651,079 | 441,122 | 423,436 | | | |
| **WEEKLY NET CASH FLOW** | | | | | | | | | | | | | | | | |
| **ENDING CASH BALANCE** | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | 6,707 | |
| **CLASSIC LINE OF CREDIT** | | | | | | | | | | | | | | | | |
| Operating Balance, Per Books | 4,515,635 | 3,931,459 | 4,455,819 | 4,736,421 | 4,728,508 | 5,023,504 | 5,157,008 | 4,789,324 | 4,484,264 | 3,848,578 | 3,607,390 | 3,668,250 | 3,445,441 | | | |
| Cash Inflated from Investment | (750,000) | | | | | | | | | | | | | | | |
| Collection Applied to L/oc | (303,617) | (339,811) | (393,800) | (441,653) | (620,637) | (342,272) | (385,200) | (349,294) | (639,000) | (276,386) | (270,300) | (623,222) | (734,119) | (607,692) | | |
| Advances | 469,596 | 779,863 | 700,263 | 779,648 | 557,195 | 221,645 | 243,224 | 221,476 | 210,931 | 210,931 | 686,689 | 508,120 | 508,120 | 488,048 | | |
| | 3,123 | 3,563 | 5,988 | 25,888 | 35,183 | 1,508 | 24,193 | 26,182 | 1,474 | 3,052 | 26,103 | 26,103 | | | | |
| Ending Balance, Per Books | 3,931,459 | 4,455,819 | 4,736,421 | 5,023,504 | 5,157,008 | 4,789,324 | 4,484,264 | 3,848,578 | 3,848,578 | 3,607,390 | 3,584,259 | 3,445,441 | 3,445,441 | 3,110,269 | | |
| **Availability** | | | | | | | | | | | | | | | | |
| DIP loan advance | | 124,337 | 209,278 | 244,927 | 211,646 | 244,741 | 525,448 | 525,611 | 525,611 | 592,259 | 743,039 | 762,359 | 729,646 | 526,646 | | |
| Reserves for Carveout and CIT Professional Fees | 121,646 | 121,646 | 121,646 | 121,646 | 121,646 | 121,646 | 121,646 | 121,646 | 121,646 | 121,646 | 121,646 | 121,646 | 121,646 | 121,646 | | |
| Adjusted Availability levels | (320,000) | (320,000) | (320,000) | (320,000) | (320,000) | (320,000) | (320,000) | (320,000) | (320,000) | (320,000) | (320,000) | (320,000) | (320,000) | (320,000) | | |
| **Without the Subordinated DIP Loan** | (750,000) | (750,000) | (750,000) | (750,000) | (750,000) | (750,000) | (750,000) | (750,000) | (750,000) | (750,000) | (750,000) | (750,000) | (750,000) | (750,000) | | |
| **Projected (Overdrawn) availability would be** | (567,837) | (572,655) | (600,127) | (652,713) | (338,673) | (291,860) | (102,743) | (159,306) | (159,306) | (104,995) | 46,367 | | | | | |

Page 1
Classic Weekly Summary

PRELIMINARY DRAFT - FOR DISCUSSION PURPOSES ONLY
SUBJECT TO REVISION

**Classic Sleep Products, Inc.**
**Borrowing Base Projection**

| | Budget 1/2–1/8 | Budget 1/9–1/15 | Budget 1/16–1/22 | Budget 1/23–1/29 | Budget 1/30–2/5 | Budget 2/6–2/12 | Budget 2/13–2/19 (CHINESE NEW YEAR) | Budget 2/20–2/26 | Budget 2/27–3/5 | Budget 3/6–3/12 | Budget 3/13–3/19 | Budget 3/20–3/26 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BORROWING BASE** | | | | | | | | | | | | |
| **ACCOUNTS RECEIVABLE** | | | | | | | | | | | | |
| Beginning Balance | 3,931,467 | 3,960,258 | 4,473,265 | 4,861,227 | 5,128,526 | 5,219,076 | 4,958,440 | 4,720,757 | 4,185,892 | 4,313,721 | 4,091,764 | 3,911,832 |
| Sales | 368,586 | 861,685 | 828,312 | 817,610 | 589,289 | 385,143 | 405,295 | 380,985 | 438,659 | 694,838 | 634,595 | 672,410 |
| Collections | (303,617) | (309,811) | (383,303) | (481,653) | (453,637) | (562,272) | (585,295) | (839,066) | (276,396) | (829,227) | (734,110) | (807,082) |
| Adjustments (chargebacks) | (36,178) | (38,867) | (56,547) | (68,658) | (45,101) | (63,507) | (57,683) | (76,785) | (34,433) | (87,576) | (80,417) | (85,909) |
| Ending Balance | 3,960,258 | 4,473,265 | 4,861,227 | 5,128,526 | 5,219,076 | 4,958,440 | 4,720,757 | 4,185,892 | 4,313,721 | 4,091,764 | 3,911,832 | 3,691,251 |
| Less Disputes and past due | 110,119 | 110,119 | 110,119 | 110,119 | 110,119 | 110,119 | 110,119 | 110,119 | 110,119 | 110,119 | 110,119 | 110,119 |
| Less Ineligible Accounts and Dilution | 198,013 | 223,663 | 243,061 | 256,426 | 260,954 | 247,922 | 236,038 | 209,295 | 315,686 | 204,588 | 195,592 | 184,563 |
| Eligible Accounts Receivable | 3,652,126 | 4,139,483 | 4,508,046 | 4,761,981 | 4,848,004 | 4,600,399 | 4,374,600 | 3,866,479 | 3,887,916 | 3,777,057 | 3,606,122 | 3,396,569 |
| Accounts Receivable Borrowing Base | 3,104,307 | 3,518,561 | 3,831,839 | 4,047,683 | 4,120,803 | 3,910,339 | 3,718,410 | 3,286,507 | 3,304,729 | 3,210,498 | 3,065,203 | 2,887,084 |
| **INVENTORY** | | | | | | | | | | | | |
| Raw Materials | 679,763 | 679,763 | 679,763 | 679,763 | 679,763 | 679,763 | 679,763 | 679,763 | 679,763 | 679,763 | 679,763 | 679,763 |
| Work in process | 39,666 | 39,666 | 39,666 | 39,666 | 39,666 | 39,666 | 39,666 | 39,666 | 39,666 | 39,666 | 39,666 | 39,666 |
| On-Hand FG-Wholesale | 1,089,929 | 1,089,929 | 1,089,929 | 1,089,929 | 1,089,929 | 1,182,929 | 1,232,929 | 1,387,929 | 1,387,929 | 1,487,929 | 1,387,929 | 1,387,929 |
| Inventory In-Transit (including duty and frieght costs) | 733,864 | 792,181 | 839,019 | 903,997 | 907,828 | 1,122,044 | 874,496 | 728,389 | 534,956 | 450,770 | 313,963 | 413,963 |
| Value Added Costs (Freight In) | 203,279 | 203,279 | 203,279 | 203,279 | 203,279 | 203,279 | 203,279 | 203,279 | 203,279 | 203,279 | 203,279 | 203,279 |
| Total RM | 719,429 | 719,429 | 719,429 | 719,429 | 719,429 | 719,429 | 719,429 | 719,429 | 719,429 | 719,429 | 719,429 | 719,429 |
| Total FG | 1,816,623 | 1,875,110 | 1,921,948 | 1,986,926 | 1,990,757 | 2,304,973 | 2,107,425 | 2,116,318 | 1,922,885 | 1,938,699 | 1,701,892 | 1,801,892 |
| | 2,536,052 | 2,594,539 | 2,641,377 | 2,706,355 | 2,710,186 | 3,024,402 | 2,826,854 | 2,835,747 | 2,642,314 | 2,658,128 | 2,421,321 | 2,521,321 |
| | 28.37% | 27.73% | 27.24% | 26.58% | 26.55% | 23.79% | 25.45% | 25.37% | 27.23% | 27.07% | 29.71% | 28.53% |
| Total Gross Inventory | 2,739,331 | 2,797,818 | 2,844,656 | 2,909,634 | 2,913,465 | 3,227,681 | 3,030,133 | 3,039,026 | 2,845,593 | 2,861,407 | 2,624,600 | 2,724,600 |
| Less: | | | | | | | | | | | | |
| Work in process | 39,666 | 39,666 | 39,666 | 39,666 | 39,666 | 39,666 | 39,666 | 39,666 | 39,666 | 39,666 | 39,666 | 39,666 |
| Inventory In-Transit (Cap @ $650k) | 83,694 | | | | | 38,711 | | | | | | |
| Slow-moving Per Sell Thru Analysis - Wholesale | 336,000 | 336,000 | 336,000 | 336,000 | 336,000 | 336,000 | 336,000 | 336,000 | 336,000 | 336,000 | 336,000 | 336,000 |
| Other Estimated Reserves | | | | | | | | | | | | |
| Total Inventory Ineligibles | 459,360 | 375,666 | 375,666 | 375,666 | 375,666 | 414,377 | 375,666 | 375,666 | 375,666 | 375,666 | 375,666 | 375,666 |
| Total Eligible Inventory | 2,279,971 | 2,422,152 | 2,468,990 | 2,533,968 | 2,537,799 | 2,813,304 | 2,654,467 | 2,663,360 | 2,469,927 | 2,485,741 | 2,248,934 | 2,348,934 |
| Available Raw Material Inventory @ | 217,524 | 217,524 | 217,524 | 217,524 | 217,524 | 217,524 | 217,524 | 217,524 | 217,524 | 217,524 | 217,524 | 217,524 |
| Available Finished Goods Inventory @ | 960,125 | 1,045,433 | 1,073,536 | 1,112,523 | 1,114,822 | 1,280,125 | 1,184,823 | 1,190,158 | 1,074,099 | 1,083,587 | 941,503 | 1,001,503 |
| Inventory Borrowing Base | 1,177,649 | 1,262,958 | 1,291,060 | 1,330,047 | 1,332,346 | 1,497,649 | 1,402,347 | 1,407,683 | 1,291,623 | 1,301,111 | 1,159,027 | 1,219,027 |
| Total Eligible Assets | 4,281,956 | 4,781,518 | 5,122,900 | 5,377,731 | 5,453,149 | 5,407,988 | 5,120,757 | 4,694,189 | 4,596,352 | 4,511,609 | 4,224,230 | 4,106,111 |