

EXHIBIT
B
tabbies®

## JMX DIP CREDIT AGREEMENT

Effective as of January ___, 2010 (the "**Effective Date**"), **JMXJMX CAPITAL PARTNERS, LLC,** a Delaware limited liability company (hereinafter "**JMX**"), is pleased to confirm the terms and conditions under which JMX may make loans and other financial accommodations to **CLASSIC SLEEP PRODUCTS, INC.,** a Delaware corporation, as debtor in possession, herein the "**Company**"), with its principal office located at the address set forth in <u>Section 1(e) of the Schedule</u>.

**WHEREAS,** on the date hereof, the Company has entered into a certain DIP Credit Agreement with CIT, pursuant to which CIT has agreed to provide the Company with certain financing on the terms and conditions set forth therein (the "**CIT DIP Credit Agreement**");

**WHEREAS,** in connection with the CIT DIP Credit Agreement, JMX and CIT have entered into a certain Subordination and Intercreditor Agreement pursuant to which JMX has subordinated to CIT all of its rights to Collateral, on the terms and conditions set forth therein (the "**Subordination Agreement**").

**WHEREAS,** it is a condition to the CIT DIP Credit Agreement that Company and JMX enter into this Agreement.

**SECTION 1     DEFINITIONS**    As used in this Agreement:

**Accounts** shall mean any and all of the Company's present and future: (a) accounts (as defined in the UCC); (b) instruments, documents, chattel paper (including electronic chattel paper) (all as defined in the UCC); (c) unpaid seller's or lessor's rights (including rescission, replevin, reclamation, repossession and stoppage in transit) relating to the foregoing or arising therefrom; (d) rights to any goods represented by any of the foregoing, including rights to returned, reclaimed or repossessed goods; (e) reserves and credit balances arising in connection with or pursuant to this Agreement; (f) guaranties, other supporting obligations, payment intangibles and letter of credit rights (all as defined in the UCC); (g) insurance policies or rights relating to any of the foregoing; (h) general intangibles pertaining to any of the foregoing (including rights to payment, including those arising in connection with bank and non-bank credit cards), and all books and records and any electronic media and software relating thereto; (i) notes, deposits or other property of the Company's account debtors securing the obligations owed by such account debtors to the Company; and (j) all Proceeds of any of the foregoing.

**Agreement** shall mean this JMX DIP Credit Agreement, together with the Schedule and any other schedules, exhibits, supplements or annexes hereto, all as may be renewed, amended, restated or supplemented from time to time.

**Asset Purchase Agreement** shall have the meaning set forth in Section 6.22.

**Avoidance Action Recoveries** shall mean any and all recoveries of cash, property or proceeds thereof in the Bankruptcy Case under any or all of Sections 502(d), 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code.

**Bankruptcy Case** shall mean the Company's case under Chapter 11 of the Bankruptcy Code, known as Case No. _____ in the Bankruptcy Court.

**Bankruptcy Case Expenses** shall mean JMX's fees and expenses (including reasonable attorneys' fees) in connection with the Bankruptcy Case (including, without limitation, attorneys' fees and expenses incurred in connection with any action to lift the automatic stay of Section 362 of the Bankruptcy Code, the prosecution of any motion to authorize the Company to obtain replacement post-petition financing and exit financing , and any other action or participation by JMX in the Bankruptcy Case or any defense or participation by JMX in any lender liability or other actions involving JMX).

**Bankruptcy Code** shall mean title 11 of the United States Code § 101 et seq., as in effect from time to time.

**Bankruptcy Court** shall mean the United States Bankruptcy Court for the District of Maryland, together with any other court having jurisdiction over the Bankruptcy Case or any proceedings therein from time to time.

**Bankruptcy Rule(s)** shall mean the Federal Rules of Bankruptcy Procedure, as amended from time to time.

**Base Rate** shall mean the rate of interest per annum announced by JPMorgan Chase Bank (or its successor) from time to time as its prime rate in effect at its principal office in New York City, which rate is not intended as the lowest rate of interest charged by JPMorgan Chase Bank to its borrowers.

**Base Rate Loan** shall mean a loan outstanding under this Agreement when the interest rate applicable thereto is based upon the Base Rate.

**Business Day** shall mean any day on which CIT is open for business in New York, New York.

**Carve-Out** shall have the meaning set forth in the Financing Orders entered by the Bankruptcy Court from time to time, and shall be in an aggregate amount not to exceed $120,000; provided, that in no case shall the Carve-Out be used for any purpose other than as permitted in a Financing Order.

**CIT** shall mean THE CIT GROUP/COMMERCIAL SERVICES, INC., a New York corporation, with offices located at 11 West 42nd Street, 11th Floor, New York, New York 10036.

**Classic Brands** shall mean Classic Brands, LLC, a Delaware limited liability company, a wholly-owned subsidiary of JMX.

**Classic Brands Sale** shall mean the sale of substantially all of the Company's assets to Classic Brands pursuant to the Asset Purchase Agreement.

**Collateral** shall mean all assets of the Company, including without limitation, all present and future Accounts, Equipment, Inventory and other Goods, Documents of Title, General Intangibles, Investment Property, Real Estate and Other Collateral, but shall not include the Avoidance Action Recoveries.

**Copyrights** shall mean all present and hereafter acquired copyrights, copyright registrations, recordings, applications, designs, styles, licenses, marks, prints and labels bearing any of the foregoing, all reissues and renewals thereof, all licenses thereof, all other general intangible, intellectual property and other rights pertaining to any of the foregoing, together with the goodwill associated therewith, and all income, royalties and other Proceeds of any of the foregoing.

**Default** shall mean any event specified in <u>Section 8.1</u> hereof, regardless of whether any requirement for the giving of notice, the lapse of time, or both, or any other condition, event or act has occurred or been satisfied.

**Deposit Money** shall mean the security deposit in the amount of $100,000 being held by Global Payment, Inc.

**Documents of Title** shall mean all present and future documents (as defined in the UCC), and any and all warehouse receipts, bills of lading, shipping documents, chattel paper, instruments and similar documents, all whether negotiable or non-negotiable, together with all Inventory and other Goods relating thereto, and all Proceeds of any of the foregoing.

**Equipment** shall mean all present and hereafter acquired equipment (as defined in the UCC) including, without limitation, all machinery, equipment, rolling stock, furnishings and fixtures, and all additions, substitutions

and replacements thereof, wherever located, together with all attachments, components, parts, equipment, auxiliary parts and accessories installed thereon or affixed thereto, whether the same constitutes personal property or fixtures and whether the interest therein is as owner, lessee or conditional vendee and all Proceeds of any of the foregoing.

**ERISA** shall mean the Employee Retirement Income Security Act of 1974, as amended from time to time, and the rules and regulations promulgated thereunder from time to time.

**Event of Default** shall have the meaning given to such term in <u>Section 8.1</u> hereof.

**Existing Financing Agreements** shall mean that certain Financing Agreement between, among others, the Company and CIT, dated August 30, 2007, as amended, pursuant to which the Company has heretofore received financial accommodations including revolving loans and letter of credit guarantees in an amount of up to $6,200,000, and all related documents, instruments supporting obligations and agreements, contemplated thereby, as any or all of the foregoing have been amended, modified, supplemented or extended from time to time.

\

**Financing Order(s)** shall mean, as applicable, an order (whether the Interim Order or the Final Order) entered in the Bankruptcy Case, from time to time, in form and substance satisfactory to JMX, authorizing the Company to obtain the financing contemplated by and described in this Agreement.

**Filing Date** shall mean January 4, 2010.

**Final Order** shall mean a final order of the Bankruptcy Court in the Bankruptcy Case authorizing and approving this Agreement and the other Loan Documents under Sections 364(c) and (d) of the Bankruptcy Code, and entered at or after a final hearing, in form and substance satisfactory to JMX.

**GAAP** shall mean generally accepted accounting principles in the United States of America as in effect from time to time and for the period as to which such accounting principles are to apply.

**General Intangibles** shall mean all present and hereafter acquired general intangibles (as defined in the UCC), and shall include, without limitation, all present and future right, title and interest in and to: (a) all Trademarks, (b) Patents, utility models, industrial models, and designs, (c) Copyrights, (d) trade secrets, (e) licenses, permits and franchises, (f) any other forms of intellectual property, (g) all customer lists, distribution agreements, supply agreements, blueprints, indemnification rights and tax refunds, (h) all monies and claims for monies now or hereafter due and payable in connection with the foregoing, including, without limitation, payments for infringement and royalties arising from any licensing agreement between the Company and any licensee of any of the Company's General Intangibles, and (i) all Proceeds of any of the foregoing.

**Goods** shall mean all present and hereafter acquired goods (as defined in the UCC) and all Proceeds thereof.

**Interim Financing Order** means an order of the Bankruptcy Court in the Bankruptcy Case authorizing and approving this Agreement and the other Loan Documents on an interim basis under Sections 364(c) and (d) of the Bankruptcy Code, and entered at or after a preliminary hearing under Rule 4001 of the Bankruptcy Code, in form and substance satisfactory to JMX.

**Inventory** shall mean all present and hereafter acquired inventory (as defined in the UCC) including, without limitation, all merchandise and inventory in all stages of production (from raw materials through work-in-process to finished goods), and all additions, substitutions and replacements thereof, wherever located,

together with all goods and materials used or usable in manufacturing, processing, packaging, selling, promoting or shipping of the foregoing, and all Proceeds of any of the foregoing.

**Investment Property** shall mean all present and hereafter acquired investment property (as defined in the UCC) together with all stock and other equity interests in the Company's subsidiaries, and all Proceeds thereof.

**Obligations** shall mean: (a) all loans, advances and other extensions of credit made by JMX to the Company or to others for the Company's account ; and (b) any and all other indebtedness, obligations and liabilities which may be owed by the Company to JMX and arising out of, or incurred in connection with, this Agreement , whether (i) now in existence or incurred by the Company from time to time hereafter, (ii) secured by pledge, lien upon or security interest in any of the Company's assets or property or the assets or property of any other person, firm, entity or corporation, (iii) such indebtedness is absolute or contingent, joint or several, matured or unmatured, direct or indirect, or (iv) the Company is liable to JMX for such indebtedness as principal, surety, endorser, guarantor or otherwise.

**Other Collateral** shall mean the following, if any (as applicable): (a) all present and hereafter established lockbox, blocked account and other deposit accounts maintained with any bank or financial institution into which the proceeds of Collateral are or may be deposited (including the Depository Accounts); (b) all cash and other monies and property in the possession or control of JMX (including negative balances in the Revolving Loan Account and cash collateral held by JMX pursuant to this Agreement); (c) all books, records, invoices, ledger cards, bills of lading and other shipping evidence, statements, correspondence, credit files and other data relating to the Collateral or any account debtor, disks and related data processing software at any time evidencing or containing information relating to any of the Collateral described herein or otherwise necessary or helpful in the collection thereof or realization thereon; (d) the superpriority administrative expense claim to be included in the Financing Order; (e) all rights and interests of Company in property of the "estate" (within the meaning of the Bankruptcy Code); and (f) all Proceeds of any of the foregoing.

**Out-of-Pocket Expenses** shall mean all of JMX's present and future costs, fees and expenses incurred in connection with this Agreement.**Patents** shall mean all present and hereafter acquired patents, patent applications, registrations, all reissues and renewals thereof, all licenses thereof, all inventions and improvements claimed thereunder, all general intangible, intellectual property and other rights of the Company with respect thereto, and all income, royalties and other Proceeds of the foregoing.

**Permitted Encumbrances** shall mean: (a) liens existing on the Effective Date and set forth in Section 1(g) of the Schedule; (b) liens on Equipment acquired by the Company after the Effective Date, provided that (i) each such lien attaches only to the Equipment so acquired, (ii) a description of the Equipment so acquired is furnished by the Company to JMX, and (iii) the indebtedness secured by such liens does not exceed $25,000 in the aggregate at any time; (c) statutory liens of landlords and liens of carriers, warehousemen, bailees, mechanics, materialmen and other like liens imposed by law, created in the ordinary course of business and securing amounts not yet due (or which are being contested in good faith, by appropriate proceedings or other appropriate actions which are sufficient to prevent imminent foreclosure of such liens), and with respect to which adequate reserves or other appropriate provisions are being maintained by the Company in accordance with GAAP; (d) deposits made (and the liens thereon) in the ordinary course of business of the Company (including, without limitation, security deposits for leases, indemnity bonds, surety bonds and appeal bonds) in connection with workers' compensation, unemployment insurance and other types of social security benefits or to secure the performance of tenders, bids, contracts (other than for the repayment or guarantee of borrowed money or purchase money obligations), statutory obligations and other similar obligations arising as a result of progress payments under government contracts; (e) liens granted to JMX by the Company; (f) liens of judgment creditors, provided that such liens do not exceed $25,000 in the aggregate at any time (other than liens bonded or insured to the reasonable satisfaction of JMX); (g) Permitted Tax Liens; (h) easements (including, without limitation, reciprocal easement agreements and utility agreements), encroachments, minor defects or irregularities in title, variation and other restrictions, charges or encumbrances (whether or not recorded) affecting the Real Estate, if applicable, and which in the aggregate (i) do not materially interfere with the occupation, use or enjoyment by the Company of its business or property so encumbered and (ii)

in the reasonable business judgment of JMX, do not materially and adversely affect the value of such Real Estate; and (i) liens in favor of CIT.

**Permitted Tax Liens** shall mean liens for taxes not yet due and payable and liens for taxes that the Company is contesting in good faith, by appropriate proceedings which are sufficient to prevent imminent foreclosure of such liens, and with respect to which adequate reserves are being maintained by the Company in accordance with GAAP; provided that in either case, such liens (a) are not filed of record in any public office, (b) are not senior in priority to the liens granted by the Company to JMX, or (c) do not secure taxes owed to the United States of America (or any departmental or agency thereof) or any State or State authority, if applicable State law provides for the priority of tax liens in a manner similar to the laws of the United States of America.

**Person** shall mean any individual, partnership, business entity, corporation, limited liability company, limited partnership, limited liability partnership, or other entity, including without limitation any governmental entity or the department thereof.

**Proceeds** shall have the meaning given to such term in the UCC, including, without limitation, all (a) payments or other proceeds from an insurance carrier with respect to any loss, casualty or damage to Collateral, and (b) payments received on account of any condemnation or other governmental taking of any Collateral.

**Real Estate** shall mean all of the Company's present and future fee and leasehold interests in real property, including the real property owned by the Company as of the Effective Date and described in Section 4.1 of the Schedule that will be subjected to a mortgage or deed of trust in favor of JMX.

**Schedule** shall mean the Schedule attached hereto and incorporated herein by reference.

**Superpriority Claim** shall mean a claim against the Company in the Bankruptcy Case which is an administrative expense claim having priority over any and all administrative expenses of the kind specified in Sections 503(b) and 507(b) of the Bankruptcy Code, including a claim pursuant to Section 364(c)(1) of the Bankruptcy Code.

**Trade Accounts** shall mean that portion of the Company's Accounts which arises from the sale of Inventory or the rendition of services in the ordinary course of the Company's business.

**Trademarks** shall mean all present and hereafter acquired trademarks, trademark registrations, recordings, applications, tradenames, trade styles, corporate names, business names, service marks, logos and any other designs or sources of business identities, prints and labels (on which any of the foregoing may appear), all reissues and renewals thereof, all licenses thereof, all other general intangible, intellectual property and other rights pertaining to any of the foregoing, together with the goodwill associated therewith, and all income, royalties and other Proceeds of any of the foregoing.

**UCC** shall mean the Uniform Commercial Code as the same may be amended and in effect from time to time in the State of New York, provided, however, in the event that, by reason of mandatory provisions of law, the attachment, perfection or priority of JMX's security interest in any Collateral is governed by the Uniform Commercial Code as enacted and in effect in a jurisdiction other than the state of New York, then the term "UCC" shall mean the Uniform Commercial Code as enacted and in effect in such other jurisdiction solely for the purposes of the provisions hereof relating to such attachment, perfection or priority and for purposes of definitions related to such provisions.

**United States Trustee** shall mean the office of the United States Trustee.

**Working Day** shall mean any Business Day on which dealings in foreign currencies and exchanges between banks may be transacted

## SECTION 2    FINANCIAL COMMITMENTS

2.1.1    Subject to the terms and conditions set forth in this Agreement, JMX agrees to make loans and advances to the Company up to an aggregate amount of [$1,000,000] (the "**JMX DIP Loan**") whereby (i) the first advance of [$_____] shall be made to the Company simultaneous with the execution of this Agreement (the "**Initial Funding**"), (ii) and the remaining balance shall be advanced to the Company in one or more advances, in each case subject to the satisfaction by the Company of the conditions set forth in Section 5.2 hereof immediately prior to such advance. JMX may apply all Proceeds of Collateral and all other payments received by JMX to the payment of the Obligations in accordance with this Agreement and consistent with the terms of any Financing Order.

## SECTION 3    INTEREST, FEES AND EXPENSES

### 3.1    Interest

3.1.1    **Interest on JMX DIP Loan.** Interest on the daily debit balance of the JMX DIP Loan at the close of each day during each month shall accrue at the applicable rate per annum set forth in Section 3.1(a) of the Schedule. In the event of any change in the Base Rate, the interest rate on Base Rate Loans shall change as of the date of such change. All interest rates shall be calculated based on a 360-day year and actual days elapsed.

3.1.2    **Default Interest Rate.** Upon the occurrence of an Event of Default, all Obligations may, at the election of JMX, bear interest at a rate equal to two percent (2.0%) per annum greater than the applicable interest rate charged under this Section 3.1 until such Event of Default is waived by JMX.

### 3.2    Fees and Expenses

3.2.1    **Omitted.**

3.2.2    **Omitted.**

3.2.3    **Omitted.**

3.2.4    **Out-of-Pocket Expenses.** The Company agrees to reimburse or pay JMX for all Out-of-Pocket Expenses when charged to or paid by JMX.

## SECTION 4    COLLATERAL

### 4.1    Grant of Security Interest.
As security for the prompt payment in full of all Obligations, the Company hereby pledges and grants to JMX a second priority general lien and replacement lien under the Bankruptcy Code upon, and security interest in, all of the Collateral. The security interests granted hereunder shall extend and attach to all Collateral which is presently in existence or hereafter acquired (and whether acquired prior or subsequent to the commencement of the Bankruptcy Case) and which is owned by the Company or in which the Company has any interest, whether held by the Company or by others for the Company's account, and wherever located.

### 4.2    Nature of Security Interest.
(a) The rights and security interests granted to JMX hereunder shall continue in full force and effect, notwithstanding the termination of this Agreement, until the termination of this Agreement and the full and final payment and satisfaction of the Obligations. Any reserves or balances to the credit of the Company, and any other property or assets of the Company in the possession of JMX, may be held by JMX as Other Collateral, and applied in whole or partial satisfaction of such Obligations when due, subject to the terms of this Agreement. The liens and security interests granted to JMX herein and any other lien or security interest which JMX may have in any other assets of the Company secure payment and performance of all present and future Obligations.

(b)    Notwithstanding JMX's security interests in the Collateral, to the extent that the Obligations are now or hereafter secured by any assets or property other than the Collateral, or by the guaranty, endorsement, assets or property of any other person, JMX shall have the right in its sole discretion to determine which rights, security, liens, security interests or remedies JMX shall at any time pursue, foreclose upon, relinquish,

subordinate, modify or take any other action with respect to, without in any way modifying or affecting any of such rights, security, liens, security interests or remedies, or any of JMX's rights under this Agreement.

(c)    Upon entry of the Financing Order, the liens and security interests granted to JMX under this Agreement shall be deemed good, valid and duly perfected liens and security interests in the Collateral, with the priorities set forth in the Financing Order, subject to no transfer or other restrictions or liens of any kind in favor of any other Person except for CIT and the Permitted Encumbrances, and shall be perfected without the recordation of any UCC financing statements, notices of lien, mortgages or other instruments of assignment.

**4.3    Limited License.** Regardless of whether JMX's security interests in any of the General Intangibles has attached or is perfected, the Company hereby irrevocably grants to JMX a royalty-free, non-exclusive license, to use the Company's Trademarks, Copyrights, Patents and other proprietary and intellectual property rights, in connection with the (i) advertisement for sale, and the sale or other disposition of, any finished or unfinished goods Inventory by JMX in accordance with the provisions of this Agreement, and (ii) the manufacture, assembly, completion and preparation for sale of any unfinished Inventory by JMX in accordance with the provisions of this Agreement.

**4.4    Collateral Reporting.** Until the termination of this Agreement and the full and final payment and satisfaction of the Obligations, the Company agrees to furnish to JMX the reports, documents and information listed in Section 4.2 of the Schedule.

**4.5    Collateral Representations, Warranties and Covenants.**

**4.5.1    Generally.** The Company represents, warrants and agrees that: (a) upon the filing of UCC financing statements covering the Collateral in all required jurisdictions, this Agreement creates a valid and perfected security interest in all personal property of the Company as to that property which may be perfected by filing and the security interests granted herein constitute and shall at all times constitute the only liens on the Collateral except for Permitted Encumbrances; (b) the Company is, or will be at the time additional Collateral is acquired by the Company, the absolute owner of the Collateral with full right to pledge, sell, transfer and create a security interest therein, free and clear of any and all claims or liens in favor of others except for Permitted Encumbrances; and (c) the Company will, at its expense, forever warrant and, at JMX's reasonable request, defend the same from any and all claims and demands of any other person.

**4.5.2    Agreements Regarding Accounts and Inventory.** (a) The Company represents and warrants to JMX that: (i) each Trade Account is, or will be when an additional Trade Account is created, based on an actual and bona fide sale and delivery of Inventory or rendition of services to customers, made by the Company in the ordinary course of its business; (ii) the invoices evidencing any such Trade Accounts are and will at all times be in the name of the Company; (iii) the customers of the Company have accepted the Inventory or services, owe and are obligated to pay the full amounts stated in the invoices according to their terms, without dispute, offset, defense, counterclaim or contra, except for disputes and other matters arising in the ordinary course of business which the Company has notified JMX pursuant to Section 4.4 hereof; (iv) [omitted]; and (v) the Company's Inventory is and will at all times be marketable in ordinary course of the Company's business, and no Inventory has been or will be produced in violation of the Fair Labor Standards Act (29 U.S.C. §201 et seq.), as amended.

(b)    The Company agrees to issue credit memoranda promptly upon accepting returns or granting allowances and to deliver to JMX copies of such credit memoranda as and when required to do so under Section 4.4 hereof. In no event shall prior recourse to any Account or other security granted to or by the Company be a prerequisite to JMX's right to demand payment of any of the Obligations. In addition, the Company agrees that JMX shall have no obligation whatsoever to perform in any respect any of the Company's contracts or obligations relating to the Accounts.

(c)    The Company agrees not to acquire any Inventory on a consignment basis, nor co-mingle its Inventory with any goods of its customers or any other person (whether pursuant to any bill and hold sale or otherwise). The Company agrees to safeguard, protect and hold all Inventory for JMX's account and to make no sale or other disposition thereof except in the ordinary course of its business, on open account and on commercially reasonable terms consistent with the Company's past practices. Notwithstanding the ordinary course of the Company's business and the Company's past practices, the Company agrees not to sell Inventory on a consignment

basis, nor retain any lien on or security interest in any sold Inventory sold by the Company. As to any such sale, transfer, lease or other disposition of Inventory, JMX shall have all of the rights of an unpaid seller, including stoppage in transit, replevin, rescission and reclamation. Upon the occurrence of an Event of Default which has not been waived in accordance with this Agreement and on notice from JMX, the Company agrees that all returned, reclaimed or repossessed merchandise or goods shall be set aside by the Company, marked with JMX's name (as secured party) and held by the Company for JMX's account.

**4.5.3    Agreements Regarding Equipment.** The Company agrees to (i) maintain the Equipment in as good and substantial repair and condition as the Equipment is now maintained (or at the time that JMX's security interest may attach to the Equipment), reasonable wear and tear excepted, (ii) make any and all repairs and replacements when and where necessary, and (iii) safeguard, protect and hold all Equipment in accordance with the terms hereof and subject to JMX's security interest. The Equipment will only be used by the Company in the operation of its business and will not be sold or held for sale or lease, except for obsolete Equipment or surplus Equipment from time to time, provided that in each such instance: (i) no Event of Default shall have occurred and remain outstanding at the time of such sale; (ii) the aggregate appraised value of the Equipment subject to sale does not exceed $25,000 in any fiscal year of the Company. As to any such sale, transfer, lease or other disposition of Equipment, JMX shall have all of the rights of an unpaid seller, including stoppage in transit, replevin, rescission and reclamation.

**4.5.4    Agreements Regarding General Intangibles.** The Company represents and warrants to JMX that as of the date hereof, the Company possesses all General Intangibles necessary to conduct the Company's business as presently conducted. The Company agrees to maintain the Company's rights in, and the value of, all such General Intangibles, and to pay when due all payments required to maintain in effect any licensed rights. The Company shall provide JMX with adequate notice of the acquisition of rights with respect to any additional Patents, Trademarks and Copyrights so that JMX may, to the extent permitted under the documentation granting such rights or applicable law, perfect its security interest in such rights in a timely manner.

**4.5.5    Commercial Tort Claims and Letter of Credit Rights.** The Company represents and warrants to JMX that as of the date hereof, the Company holds no interest in any commercial tort claims and the Company is not the beneficiary of any letter of credit. If the Company at any time holds or acquires a commercial tort claim or becomes a beneficiary under any letter of credit, the Company shall promptly notify JMX in writing thereof and shall execute such further documents or do such further acts as JMX may reasonably request to grant to JMX valid and perfected security interests in such commercial tort claims and letters of credit, as the case may be.

**4.5.6    Further Assurances.** The Company agrees to comply with the requirements of all state and federal laws in order to grant to JMX valid and perfected security interests in the Collateral. JMX is hereby authorized by the Company to file from time to time any financing statements, continuations or amendments covering the Collateral without the Company's signature in accordance with the provisions of the UCC. The Company hereby consents to and ratifies the filing of any financing statements covering the Collateral by JMX on or prior to the Effective Date. The Company agrees to do whatever JMX may reasonably request, from time to time, by way of: (a) filing notices of liens, financing statements, amendments, renewals and continuations thereof; (b) cooperating with JMX's agents and employees; (c) keeping Collateral records; (d) transferring proceeds of Collateral to JMX's possession in accordance with the terms hereof; (e) obtaining waivers from landlords, warehousemen, third party processors and mortgagees; and (f) performing such further acts as JMX may reasonably require in order to effect the purposes of this Agreement.

## SECTION 5    CONDITIONS PRECEDENT

**5.1    Conditions Precedent to Initial Funding.** The obligation of JMX to make the initial loans and financial accommodations hereunder is subject to the satisfaction of the following conditions precedent:

**5.1.1    Loan Documents.** The Company \shall have executed and delivered to JMX this Agreement and all other documents required by JMX or its counsel to consummate the lending arrangement contemplated between the Company and JMX.

**5.1.2    Lien Searches.**  JMX shall have received tax, judgment, litigation, and UCC searches from all jurisdictions reasonably required by JMX, and such searches shall verify that JMX has a security interest in the Collateral and any other assets securing the Obligations, subject to Permitted Encumbrances.

**5.1.3    Insurance.**  The Company shall have delivered to JMX evidence satisfactory to JMX that: (i) all insurance required by this Agreement is in full force and effect and (ii) JMX has been named as loss payee with respect thereto in a manner satisfactory to JMX.

**5.1.4    UCC Filings.**  All UCC financing statements and similar documents required to be filed in order to create in favor of JMX a second priority perfected security interest in the Collateral and any other assets securing the Obligations (to the extent that such a security interest may be perfected by a filing under the UCC or applicable law) shall have been properly filed in each office in each jurisdiction required.  JMX shall have received (i) acknowledgment copies of all such filings and (ii) evidence that all necessary filing fees, taxes and other expenses related to such filings have been paid in full.

**5.1.5    Indebtedness.**   The Company shall have no other indebtedness outstanding and owing to any Person after the Effective Date other than (a) trade accounts payable and other indebtedness specifically permitted by JMX in its sole discretion, (b) indebtedness to CIT under the CIT DIP Credit Agreement or any other Loan Documents referenced therein, and (c) unsecured pre-petition indebtedness as disclosed in the Company's schedules and statements of financial affairs filed with the Bankruptcy Court, as the same may be amended, and proofs of claim filed against the Company.

**5.1.6    Certain Bankruptcy Case Matters.**

      **(a)**    **Compliance with Requirements.**  The Company shall have complied in full with the notice and other requirements of the Bankruptcy Code and the related local and Federal rules of bankruptcy procedure in a manner acceptable to JMX and its counsel.

      **(b)**    **Finding of Good Faith.**  The Bankruptcy Court shall have found that the loans contemplated by this Agreement are made by JMX, and that all other Obligations are incurred by Company hereunder in "good faith" within the meaning of Section 364(e) of the Bankruptcy Code.

      **(c)**    **Interim Financing Order.**  The Bankruptcy Court shall have entered the Interim Financing Order by no later than seven (7) days after the Filing Date in form and substance satisfactory to JMX, which Interim Financing Order shall: (i) have been entered upon application or motion of the Company reasonably satisfactory to JMX and in substance to JMX and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by JMX; (ii) be in full force and effect and shall not have been amended, modified or stayed without the written consent of JMX or reversed; and (iii) not be the subject of a pending objection, appeal or motion for reconsideration in any respect. The Company and JMX shall be entitled to rely in good faith upon the Interim Financing Order notwithstanding any such objection, appeal or motion for reconsideration. JMX shall be permitted, and the Company shall be required, to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection, appeal or motion for reconsideration unless the Interim Financing Order has been stayed by a court of competent jurisdiction.

      **(d)**    **First Day Orders.**  JMX shall have received drafts of the "first day" pleadings in form and substance satisfactory to JMX on or before the date of the initial loans hereunder.

**5.2    Conditions to Each Extension of Credit.**  The obligation of JMX to make any loans and financial accommodations hereunder is subject to the satisfaction of the following conditions precedent:

**5.2.1    Representations and Warranties.**  Each of the representations and warranties made by the Company in or pursuant to this Agreement shall be true and correct in all material respects on and as of the date of such loan or financial accommodation as though made on and as of such date, except to the extent that such representations and warranties relate solely to an earlier date.

**5.2.2    No Default or Material Adverse Change.**  No Default or Event of Default shall have occurred and be continuing or would result from the making of such loan or financial accommodation and no material adverse

change shall have occurred in the financial condition, business, prospects, profits, operations or assets of the Company, or the Company's affiliates since the date of the latest financial statements delivered to JMX prior to the Effective Date.

    **5.2.3**   **Omitted.**

    **5.2.4**   **Compliance with Financing Orders.**  The extension of credit requested shall not cause the aggregate outstanding amount of the loans under this Agreement to exceed the amount then authorized by the applicable Financing Order, as the case may be, or any order modifying, reversing, staying or vacating such order shall have been entered or any appeal of such order shall have been timely filed.

    **5.2.5**   **Final Order.**  Within twenty-five (25) days of the Filing Date, and for each extension of credit thereafter, JMX shall have received satisfactory evidence of the entry of the Final Order.

    **5.2.6**   **Financing Order.**  The Final Order, or, prior to the entry of the Final Order, the Interim Financing Order, (i) shall have been entered upon application or motion of the Company reasonably satisfactory in form and substance to JMX and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by JMX; (ii) shall be in full force and effect and shall not have been amended, modified or stayed without the written consent of JMX or reversed; and (iii) not be the subject of a pending objection, appeal or motion for reconsideration in any respect. The Company and JMX shall be entitled to rely in good faith upon the applicable Financing Order notwithstanding any such objection, appeal or motion for reconsideration. JMX shall be permitted, and the Company shall be required, to perform their respective obligations in compliance with this Agreement, notwithstanding any such objection, appeal or motion for reconsideration unless the applicable Financing Order has been stayed by a court of competent jurisdiction.

**SECTION 6**   **REPRESENTATIONS, WARRANTIES AND COVENANTS.**  The Company represents and warrants to JMX as follows, and the Company covenants that the following representations will continue to be true, and that the Company will at all times comply with all of the following covenants until the termination of this Agreement and the full and final payment and satisfaction of the Obligations:

**6.1**   **Organization Matters; Collateral Locations.**  Section 1 of the Schedule correctly and completely sets forth (a) the Company's exact name, as currently reflected by the records of the Company's State of incorporation or formation, (b) the Company's state of incorporation or formation, (c) the Company's federal employer identification number and state organization identification number (if any), (d) the address of the Company's chief executive office and all locations of Collateral, and (e) the names and jurisdictions of incorporation of all subsidiaries of the Company.

**6.2**   **Financial and Other Information.**  All financial statements of the Company previously or hereafter furnished to JMX present fairly, in all material respects, the financial condition of the Company as of the date of such financial statements. All written information now or heretofore furnished by the Company to JMX is true and correct, in all material respects, as of the date with respect to which such information was furnished. None of the pleadings, agreements, documents and certificates filed with the Bankruptcy Court in connection with the Bankruptcy Case, at the time of filing, contained any untrue statement of a material fact or omitted to state any material fact necessary in order to make such filing, in light of the circumstances under which it was made, not misleading.

**6.3**   **Power and Authority; Conflicts; Enforceability.**  (a) The Company has full power and authority to execute and deliver this Agreement and the other Loan Documents to which it is a party, and to perform all of the Company's obligations thereunder.

    **(b)**   The execution and delivery by the Company of this Agreement, and the performance of the Company's obligations hereunder, have been duly authorized by all necessary corporate or other relevant action, and do not (i) require any consent or approval of any director, shareholder, partner or member of the Company that has not been obtained, (ii) violate any term, provision or covenant contained in the organizational documents of the Company (such as the certificate or articles of incorporation, certificate of origin, partnership agreement, by-laws or

operating agreement), (iii) violate, or cause the Company to be in default under, any law, rule, regulation, order, judgment or award applicable to the Company or its assets, or (iv) violate any term, provision, covenant or representation contained in, or constitute a default under, or result in the creation of any lien under, any loan agreement, lease, indenture, mortgage, deed of trust, note, security agreement or pledge agreement to which the Company is a signatory or by which the Company or any of the Company's assets are bound or affected.

(c)     This Agreement constitutes legal valid and binding obligations of the Company, enforceable in accordance with their respective terms, subject to applicable bankruptcy, insolvency, moratorium, fraudulent transfer and other laws affecting creditors' rights generally, and subject to general principles of equity, regardless of whether considered in a proceeding at law or in equity.

(d)     The Company agrees to qualify to do business, and to remain qualified to do business and in good standing, in each jurisdiction where the failure to so qualify or to remain qualified or in good standing, would have a material adverse effect on the Company.

**6.4    Compliance with Laws.**  The Company and the Company's properties are and will continue to be in compliance with all federal, state and local acts, rules and regulations, and all orders of any federal, state or local legislative, administrative or judicial body or official, except to the extent the failure to so comply would not have a material adverse effect on the Company.  The Company has obtained and will continue to maintain all permits, approvals, authorizations and licenses necessary to conduct its business as presently conducted, except to the extent the failure to have such permits, approvals, authorizations or licenses would not have a material adverse effect on the Company.

**6.5    Environmental Matters.**  (a)     None of the operations of the Company are the subject of any federal, state or local investigation to determine whether any remedial action is needed to address the presence or disposal of any environmental pollution, hazardous material or environmental clean-up of the Real Estate.  No enforcement proceeding, complaint, summons, citation, notice, order, claim, litigation, investigation, letter or other communication from a federal, state or local authority has been filed against or delivered to the Company, regarding or involving any release of any environmental pollution or hazardous material on any real property now or previously owned or operated by the Company.

(b)     The Company has no known contingent liability with respect to any release of any environmental pollution or hazardous material on any real property now or previously owned or operated by the Company.

(c)     The Company is and will continue to be in compliance with all environmental statutes, acts, rules, regulations and orders applicable to the operation of the Company's business, except to the extent that the failure to so comply would not have a material adverse effect.  The Company agrees to promptly notify JMX in writing of (i) any expenditure (actual or anticipated) in excess of $25,000 for environmental clean-up, environmental compliance or environmental testing and (ii) the Company's receipt of notice from any local, state or federal authority advising the Company of any environmental liability (real or potential).

**6.6    Pending Litigation.**  Except as previously disclosed by the Company to JMX in writing, there exist no actions, suits or proceedings of any kind by or against the Company pending in any court or before any arbitrator or governmental body, or to the best of the Company's knowledge threatened against the Company, that, individually or in the aggregate, could reasonably be expected to have a material adverse effect on the Company.

**6.7    Maintenance of Financial Records; Inspections.**  The Company agrees to maintain books and records pertaining to the Collateral and the Company's financial matters in such detail, form and scope as JMX reasonably shall require and agrees that such books and records will reflect JMX's interest in the Collateral.  The Company agrees that JMX or its agents may enter upon the Company's premises at any time during normal business hours, and from time to time, in order to (i) examine and inspect the books and records of the Company, and make copies thereof and take extracts therefrom, and (ii) verify, inspect and perform physical counts and other valuations of the Collateral and any and all records pertaining thereto.  The Company irrevocably authorizes all accountants and third parties to disclose and deliver directly to JMX, at the Company's expense, all financial statements and information, books, records, work papers and management reports generated by them or in their possession regarding the

Company or the Collateral. All out-of-pocket costs, fees and expenses incurred by JMX in connection with such examinations, inspections, physical counts and other valuations shall constitute Out-of-Pocket Expenses.

**6.8    Omitted.**

**6.9    Insurance.** The Company agrees to maintain insurance, including, without limitation, insurance on the Company's assets, including, without limitation, the Real Estate, Equipment and Inventory, and marine cargo insurance, under such policies of insurance, with such insurance companies, in such reasonable amounts and covering such insurable risks as are at all times reasonably satisfactory to JMX. All policies covering the Company's assets, including, without limitation, the Real Estate, Equipment and Inventory are, to be made payable to JMX, in case of loss, under a standard non-contributory "lender" or "secured party" clause or endorsement, and are to contain such other provisions as JMX may require to fully protect JMX's interest in the Company's assets, including, without limitation, the Real Estate, Inventory and Equipment and to any payments to be made under such policies, including, without limitation, provisions (x) for not less than thirty (30) days prior written notice to JMX of the exercise of any right of cancellation or material change and (y) that JMX's right to payment under any property insurance policy will not be invalidated by any act or neglect of, or any breach of warranty or condition by, the Company or any party. All original policies or true copies thereof are to be delivered to JMX, premium prepaid, with such loss payable endorsement in JMX's favor. If the Company fails to maintain such insurance on its assets, including, without limitation, the Real Estate, Equipment and Inventory, JMX may arrange for such insurance, but at the Company's expense and without any responsibility on JMX's part for: (i) obtaining the insurance; (ii) the solvency of the insurance companies; (iii) the adequacy of the coverage; or (iv) the collection of claims. JMX may apply any insurance proceeds to the cost of repairs, or replacement of any Collateral and/or, at JMX's option, to payment of any of the Obligations in any order or manner as JMX determines.

**6.10    Taxes.** The Company agrees to pay when due all taxes lawfully levied, assessed or imposed upon the Company or the Collateral (including all sales taxes collected by the Company on behalf of the Company's customers in connection with sales of Inventory and all payroll taxes collected by the Company on behalf of the Company's employees), unless the Company is contesting such taxes in good faith, by appropriate proceedings, and is maintaining adequate reserves for such taxes in accordance with GAAP. Notwithstanding the foregoing, if a lien securing any taxes is filed in any public office, then the Company shall pay all taxes secured by such lien immediately and remove such lien of record promptly.

**6.11    Omitted.**

**6.12    Financial and Other Reporting.** The Company agrees that it will deliver to JMX: (a) on a timely basis, the financial statements and/or information listed in Section 5.1 of the Schedule; (b) notice of the occurrence of any Default or Event of Default immediately upon knowledge thereof and (c) from time to time, such further information regarding the business affairs and financial condition of the Company as JMX may reasonably request. In addition, should the Company modify its accounting principles and procedures from those in effect on the Effective Date, the Company agrees to prepare and deliver to JMX statements of reconciliation in form and substance reasonably satisfactory to JMX.

**6.13    Negative Covenants.** The Company agrees not to:

   **6.13.1    Indebtedness.** Incur or create any indebtedness, except for (a) current indebtedness maturing in less than one year and incurred in the ordinary course of business for raw materials, supplies, equipment, services, taxes or labor, (b) indebtedness to CIT, (c) indebtedness arising this Agreement and (d) any other indebtedness to which JMX has expressly consented in writing.

   **6.13.2    Sale of Assets.** Sell, lease, assign, transfer or otherwise dispose of Collateral, except (a) for sales of Inventory in the ordinary course of business, (b) for a sale pursuant to Section 363 of the Bankruptcy Code, on terms and conditions acceptable to CIT in its sole discretion, (c) that the Company may make pro rata payments of the Deposit Money to the general unsecured creditors of the Company, and (d) as otherwise specifically permitted by this Agreement.

**6.13.3    Pledge of Assets.** Mortgage, assign, pledge, transfer or otherwise permit any lien, charge, security interest, encumbrance or judgment (whether as a result of a purchase money or title retention transaction, or other security interest, or otherwise) to exist on any of the Collateral or its other assets, whether now owned or hereafter acquired, except for Permitted Encumbrances.

**6.13.4    Corporate Change.** Merge, consolidate or otherwise alter or modify its corporate name, principal place of business, structure, or existence, or enter into or engage in any operation or activity materially different from that presently being conducted by the Company, or any subsidiary of the Company, as the case may be.

**6.13.5    Guaranty Obligations.** Assume, guarantee, endorse, or otherwise become liable upon the obligations of any person, firm, entity or corporation, except pursuant to negotiable instruments for deposit or collection or similar transactions in the ordinary course of business;

**6.13.6    Dividends and Distributions.** Declare or pay any dividend or distributions of any kind on, or purchase, acquire, redeem or retire, any of its equity interests (of any class or type).

**6.13.7    Omitted.**

**6.13.8    Investments.** (a) create any new subsidiary, or (b) make any advance or loan to, or any investment in, any firm, entity, person or corporation, or (c) acquire all or substantially all of the assets of, or any capital stock or any equity interests in, any firm, entity or corporation, other than current investments of the Company, the Guarantor and any subsidiary of the Company, as the case may be, in existing subsidiaries of such entities.

**6.13.9    Omitted.**

**6.13.10    Chapter 11 Claims.** Incur, create, assume, suffer to exist or permit any administrative expense or claim (whether now existing or hereafter arising, of any kind or nature whatsoever), other than the Carve-Out, which is superior to or pari passu with the liens and security interests granted to JMX by this Agreement or the Financing Order.

**6.14    Use of Proceeds and Payments of Expenses and Claims.** No proceeds of any JMX DIP Loan shall be used to pay administrative or priority costs, fees, expenses or claims under the Bankruptcy Case, except that the proceeds may be used to repay obligations to CIT under the CIT DIP Credit Agreement and the other Loan Documents and/or the Existing Financing Agreements (each as defined in the CIT DIP Credit Agreement).

**6.15    Superpriority Claim Status.** Upon entry of the Financing Order, the Obligations of the Company will constitute allowed administrative expenses in the Bankruptcy Case, having priority in payment over all other administrative expenses and unsecured claims against the Company now existing or hereafter arising, of any kind or nature whatsoever, including without limitation, all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c), 507(a), 507(b), 546(c), 726 and 1114 of the Bankruptcy Code, subject, as to priority, only to the Carve-Out and to Permitted Encumbrances having priority of payment over the Obligations to the extent set forth in this Agreement or in the Financing Order.

**6.16    Bankruptcy Case Information.** The Company shall promptly notify JMX of (a) the filing of (and provide JMX with copies of) all operating and other reports and/or financial information provided by the Company to the Bankruptcy Court, the United States Trustee, and any other statutorily appointed or ad hoc committee in the Bankruptcy Case, and copies of all pleadings, motions, applications, judicial information, financial information, and other documents filed by or on behalf of the Company with the Bankruptcy Court in the Bankruptcy Case, or distributed by or on behalf of the Company to any official committee appointed in the Bankruptcy Case, and (b) any application or motion of any Person seeking relief from the automatic stay under Section 362 of the Bankruptcy Code or any other application, motion or pleading filed in the Bankruptcy Case that might result in Default or an Event of Default hereunder.

**6.17    Payments of Bankruptcy Case Fees and Claims.** The Company shall make timely payment of all fees payable to the United States Trustee, if any, in the Bankruptcy Case pursuant to 28 U.S.C. Section 1930 (a)(6). In

addition, without prior approval of the Bankruptcy Court and the prior written consent of JMX, the Company shall not make any payment of any proceeds constituting part of the Collateral or other cash to any creditor of the Company on account of claims arising prior to the commencement of the Bankruptcy Case (including, without limitation, payments in respect of reclamation claims of unpaid suppliers of goods delivered to the Company to the commencement of the Bankruptcy Case (regardless of whether such claims have been granted administrative expense priority status pursuant to Section 546(c) of the Bankruptcy Code).

**6.18**    **No Modification or Stay.**  The Company will not, directly or indirectly, seek, consent or suffer to exist (i) any modification, stay, vacation or amendment to either Financing Order, unless CIT has consented to such modification, stay, vacation or amendment in writing, (ii) a priority claim for any administrative expense or unsecured claim (now existing or hereafter arising of any kind or nature whatsoever, including any administrative expenses of the kind specified in the Bankruptcy Code, including Sections 105(a), 326, 328, 330, 331, 503(a), 503(b), 506(c), 507, 546(c), 546(d), 726, 1113 and 1114 of the Bankruptcy Code) equal or superior to the Superpriority Claim of JMX in respect to the Obligations, except for the Carve-Out; or (iii) any lien on any Collateral, having a priority equal or superior to the lien in favor of JMX in respect of the Obligations, except for the Carve-Out and Permitted Encumbrances.

**6.19**    **Compliance with Applicable Law.**  The Bankruptcy Case was commenced on the Filing Date in accordance with applicable law and proper notice thereof and the proper notice under the Bankruptcy Code for each of (a) the motion seeking approval of, among other things, this Agreement and the Interim Financing Order and the Final Order, (b) the hearing for the approval of the Interim Financing Order and (c) the hearing for the approval of the Final Order, has been or will be given. The Company shall give, on a timely basis as specified in the Financing Order, all notices required to be given to all parties specified in such Financing Order.

**6.20**    **No Extension.**  The Company shall not request any extension of the period of time within which the Company has exclusive rights to file a plan under Section 1121 of the Bankruptcy Code.

**6.21**    **Financing Orders.**  The Company covenants and agrees, in each case, unless extended by JMX in its sole discretion, (a) the Interim Financing Order shall be entered no later than January 4, 2010; (b) the Final Order shall be entered no later than January 29, 2010.

**6.22**    **Asset Purchase Agreement.**  On or before January [__], 2009, the Company and Classic Brands shall enter into an asset purchase agreement ("**Asset Purchase Agreement**") for the sale of all or substantially all of the Company's assetst. In the event that the Asset Agreement is terminated by the Company, and/or the assets of the Company are sold in a Third Party Sale (as defined in the Asset Purchase Agreement, then the JMX DIP Loan shall then automatically be due and payable and, in the event of such Third Party Sale, the Company will, subject to the Subordination Agreement, direct payment of the proceeds from such third party sale to JMX to be applied to the Obligations arising from the JMX Dip Loan.

## SECTION 7    POWERS

Subject to the Subordination Agreement, the Company hereby authorizes JMX, or any person or agent JMX may designate, at the Company's cost and expense, to exercise all of the following powers, which authority shall be irrevocable until termination of this Agreement and the full and final payment and satisfaction of all Obligations: (a) to receive, take, endorse, sign, assign and deliver, all in the name of JMX or the Company, any and all checks, notes, drafts, and other documents or instruments relating to the Collateral; (b) to receive, open and dispose of all mail addressed to the Company and to notify postal authorities to change the address for delivery thereof to such address as JMX may designate; (c) to request from customers indebted on Accounts at any time, in the name of JMX information concerning the amounts owing on the Accounts; (d) to request from customers indebted on Accounts at any time, in the name of the Company, in the name of a certified public accountant designated by JMX or any other designee of JMX, information concerning the amounts owing on the Accounts; (e) to transmit to customers indebted on Accounts notice of JMX's interest therein and to notify customers indebted on Accounts to make payment directly to JMX for the Company's account; and (f) to take or bring, in the name of JMX or the Company, all steps, actions, suits or proceedings deemed by JMX necessary or desirable to enforce or effect collection of the Accounts. The powers set forth in clauses (b), (c), (e) and (f) of this Section 7 may only be exercised if an Event of Default shall have occurred and remain outstanding.

**SECTION 8    EVENTS OF DEFAULT AND REMEDIES**

**8.1    Events of Default.** Each of the following events shall constitute an "Event of Default":

    **8.1.1**    The failure of the Company to pay any of the Obligations when due;

    **8.1.2**    Cessation of the business of the Company, except as the result of the sale of substantially all of the assets of the Company and the application of the proceeds of such sale to the Obligations;

    **8.1.3**    The failure of the Company to generally meet in the Bankruptcy Case its post-petition debts as they mature;

    **8.1.4**    (a)    the bringing of a motion by the Company or any other Person in the Bankruptcy Case to obtain additional financing under Section 364 of the Bankruptcy Code, to use cash collateral of JMX under Section 363 of the Bankruptcy Code, or to recover from any portion of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c), Section 552 of the Bankruptcy Code, or otherwise;

        (b)    the Company or any other Person seeks to incur, in a manner inconsistent with this Agreement or the then applicable Financing Order, indebtedness that is secured by a lien with priority equal to or superior to the post-petition liens or which is given super-priority administrative expense status under Bankruptcy Code Section 364(c)(i);

        (c)    notice is given of a sale under Section 363 of the Bankruptcy Code of all or part of the post-petition Collateral as to which JMX is not proposed to be paid in full or with respect to which JMX has not provided its prior written consent;

        (d)    the Bankruptcy Court shall enter an order granting relief from or modifying the automatic stay of Section 362 of the Bankruptcy Code (i) to allow any creditor to execute upon or enforce a lien on any Collateral, or (ii) with respect to any lien of, or the granting of any lien on, any Collateral to any state or local environmental or regulatory agency or authority, which in either case would have a material adverse effect on (A) the Company's ability to repay the Obligations hereunder in accordance with the terms hereof or (B) the Collateral or JMX's liens granted hereunder on the Collateral or the priority of a material portion of such liens;

        (e)    an order is entered by the Bankruptcy Court appointing, or the Company or any other Person files an application for an order seeking the appointment of, without the prior written consent of JMX, an examiner with enlarged powers relating to the execution of the business (i.e., powers beyond those set forth in Sections 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code;

        (f)    an order is entered by the Bankruptcy Court, without the prior written consent of JMX, (A) permitting any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Company equal or superior to the priority of JMX with respect to the Obligations, except for the Carve-Out, or (B) granting or permitting the granting of a lien on the Collateral other than a Permitted Encumbrance;

        (g)    the Company fails to file in the Bankruptcy Case a plan of reorganization containing a provision for termination of this Agreement and the indefeasible repayment in full, in cash of the Obligations of the Company within the exclusivity period provided in Section 1121 of the Bankruptcy Code, or seeks an extension of such exclusivity period without the prior written consent of JMX, or otherwise fails to provide for the indefeasible payment in full , in cash, of the Obligations;

        (h)    an order is entered by the Bankruptcy Court confirming a plan of reorganization in the Bankruptcy Case which does not (i) contain a provision for termination of this Agreement and the indefeasible payment in full in cash of all Obligations of the Company under this Agreement on or before the effective date of such plan or plans, and (ii) provide for the continuation of the liens and security interests granted to JMX  (and

maintains the priorities of such liens and security interests) until such plan effective date, unless the Obligations have been indefeasibly paid in full, in cash, and this Agreement and all other Loan Documents have been terminated;

(i)     any Person shall attempt to invalidate, reduce or otherwise impair the liens or security interests of JMX, or any claims or rights against such Person, or to subject any of the Collateral to assessment pursuant to Section 506(c), 552(b), or otherwise, of the Bankruptcy Code, or pursuant to other applicable law;

(j)     any lien or security interest created by this Agreement or the Financing Order shall, for any reason, cease to be valid;

(k)     any action is commenced which contests any provision of any Financing Order, or the validity, perfection, priority or enforceability of any of the liens and security interests of JMX;

(l)     the Bankruptcy Case is dismissed, or is converted to a case under chapter 7 of the Bankruptcy Code or a chapter 11 trustee is appointed;

(m)     the Company shall fail to comply with or perform any of the terms or conditions of the then applicable Financing Order; or

(n)     a Third Party Sale (as defined in the Asset Purchase Agreement)

**8.1.5**    The Bankruptcy Court shall enter any order (i) suspending, superseding, revoking, reversing, staying, vacating, rescinding, modifying, supplementing or otherwise amending either the Financing Order, this Agreement (except as otherwise approved by JMX in writing), or (ii) to grant or permit the grant of a lien on the Collateral other than Permitted Encumbrances;

**8.1.6**    The breach by the Company of any warranty, representation or covenant contained in this Agreement;

**8.1.7**    The occurrence of any default or event of default (after giving effect to any applicable grace or cure period) under the CIT DIP Credit Agreement or any of the Loan Documents or Existing Financing Agreement referenced therein;

**8.1.8**    The Company shall (i) engage in any "prohibited transaction" as defined in ERISA, (ii) incur any "accumulated funding deficiency" as defined in ERISA, (iii) incur any "reportable event" as defined in ERISA, (iv) terminate any "plan", as defined in ERISA or (v) become involved in any proceeding in which the Pension Benefit Guaranty Corporation shall seek appointment, or is appointed, as trustee or administrator of any "plan", as defined in ERISA, and with respect this subsection 8.1.7, such event or condition either (x) remains uncured for a period of thirty (30) days from date of occurrence and (y) could, in JMX's reasonable business judgment, subject the Company to any tax, penalty or other liability having a material adverse effect on the Company;

**8.1.9**    (a) The failure of Michael Zippelli to remain actively engaged in the management of the Company (other than by reason of death or permanent disability), or (b) the sale, assignment or other transfer of capital stock in the Company, or any voting rights associated therewith, without the prior written consent of JMX;

**8.1.10**    A final judgment for the payment of money in excess of $25,000 shall be rendered against the Company;

**8.1.11**    The occurrence of any default or event of default (after giving effect to any applicable grace or cure periods) under any instrument or agreement evidencing or governing any other indebtedness of the Company (other than trade indebtedness) having a principal amount in excess of $50,000;

**8.1.12**    Omitted. ;

**8.1.13**    The entry of an order in the Bankruptcy Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owning under this Agreement or the other Loan Documents; or

**8.1.14**   The failure of the Company to perform, keep, or observe any of the covenants, conditions, premises, agreements or obligations of the Company under the applicable Financing Order.

**8.1.15**   Omitted.

**8.2**   **Remedies With Respect to Outstanding Obligations.**   Upon the occurrence of a Default or an Event of Default, at the option of JMX, all loans, advances and extensions of credit provided for in Section 2 hereof shall be thereafter made in JMX's sole discretion, and the obligation of JMX to make additional advances shall cease unless such Default is cured to JMX's satisfaction or such Event of Default is waived in accordance herewith.  In addition, upon the occurrence of an Event of Default, JMX may, at its option (a) declare all Obligations immediately due and payable, (b) charge the Company the default rate of interest on all then outstanding or thereafter incurred Obligations in lieu of the interest provided for in Section 3.1.3 hereof, and (c) immediately terminate this Agreement upon notice to the Company.   Notwithstanding the foregoing, (x) JMX's commitment to make loans, advances and extensions of credit provided for in Section 2 hereof automatically shall terminate without any declaration, notice or demand by JMX upon the commencement of any proceeding described in Sections 8.1.4 or 8.1.5 hereof, and (y) this Agreement automatically shall terminate and all Obligations shall become due and payable immediately without any declaration, notice or demand by JMX, upon the commencement of any proceeding or order described in Section 8.1.4 or 8.1.5.  The exercise of any option is not exclusive of any other option that may be exercised at any time by JMX.

**8.3**   **Remedies With Respect to Collateral.**   Subject to the Subordination Agreement, immediately after the occurrence of an Event of Default and the notice required under the then applicable Financing Order, JMX may, at its option, to the extent permitted by applicable law: (a) remove from any premises where same may be located any and all books and records, computers, electronic media and software programs associated with any Collateral (including electronic records, contracts and signatures pertaining thereto), documents, instruments and files, and any receptacles or cabinets containing same, relating to the Accounts, and JMX may use, at the Company's expense, such of the Company's personnel, supplies or space at the Company's places of business or otherwise, as may be necessary to properly administer and control the Accounts or the handling of collections and realizations thereon; (b) bring suit, in the name of the Company or JMX, and generally shall have all other rights respecting the Accounts, including, without limitation, the right to (i) accelerate or extend the time of payment, (ii) settle, compromise, release in whole or in part any amounts owing on any Accounts and (iii) issue credits in the name of the Company or JMX; (c) sell, assign and deliver the Collateral and any returned, reclaimed or repossessed merchandise, with or without advertisement, at public or private sale, for cash, on credit or otherwise, at JMX's sole option and discretion, and JMX may bid or become a purchaser at any such sale, free from any right of redemption, which right is hereby expressly waived by the Company; (d) foreclose JMX's security interests in the Collateral by any available judicial procedure, or take possession of any or all of the Collateral without judicial process, and to enter any premises where any Collateral may be located for the purpose of taking possession of or removing the same; and (e) exercise any other rights and remedies provided in law, in equity, by contract or otherwise.  JMX shall have the right, without notice or advertisement, to sell, lease, or otherwise dispose of all or any part of the Collateral whether in its then condition or after further preparation or processing, in the name of the Company or JMX, or in the name of such other party as JMX may designate, either at public or private sale or at any broker's board, in lots or in bulk, for cash or for credit, with or without warranties or representations (including, without limitation, warranties of title, possession, quiet enjoyment and the like), and upon such other terms and conditions as JMX in its sole discretion may deem advisable, and JMX shall have the right to purchase at any such sale.  If any Inventory and Equipment shall require rebuilding, repairing, maintenance or preparation, JMX shall have the right, at its option, to do such of the aforesaid as is necessary, for the purpose of putting the Inventory and Equipment in such saleable form as JMX shall deem appropriate.  The Company agrees, at the request of JMX, to assemble the Inventory and Equipment, and to make it available to JMX at premises of the Company or elsewhere and to make available to JMX the premises and facilities of the Company for the purpose of JMX's taking possession of, removing or putting the Inventory and Equipment in saleable form.  If notice of intended disposition of any Collateral is required by law, it is agreed that ten (10) days notice shall constitute reasonable notification and full compliance with the law.  The net cash proceeds resulting from JMX's exercise of any of the foregoing rights (after deducting all Out-of-Pocket Expenses relating thereto) shall be applied by JMX to the payment of the Obligations, whether due or to become due, in such order as JMX may elect, and the Company shall remain liable to JMX for any deficiencies, and JMX in turn agrees to remit to the Company or its successors or assigns, any surplus resulting therefrom.  The enumeration of the foregoing

17

rights is not intended to be exhaustive and the exercise of any right shall not preclude the exercise of any other right of JMX under applicable law, all of which shall be cumulative.

**SECTION 9     TERMINATION**

This Agreement shall terminate at the option of JMX (but subject to Section 8.2), upon the occurrence of an Event of Default.   All Obligations shall become due and payable in full on the date of any termination hereunder.

**SECTION 10     GENERAL INDEMNITY**

In addition to the Company's agreement to reimburse JMX for Out-of-Pocket Expenses, but without duplication, the Company hereby agrees to indemnify JMX and its officers, directors, employees, attorneys and agents (each, an "Indemnified Party") from, and to defend and hold each Indemnified Party harmless against, any and all losses, liabilities, obligations, claims, actions, judgments, suits, damages, penalties, costs, fees, expenses (including reasonable attorney's fees) of any kind or nature which at any time may be imposed on, incurred by, or asserted against, any Indemnified Party:

(a)     as a result of JMX's exercise of (or failure to exercise) any of JMX's rights and remedies hereunder, including, without limitation, (i) any sale or transfer of the Collateral, (ii) the preservation, repair, maintenance, preparation for sale or securing of any Collateral, and (iii) the defense of JMX's interests in the Collateral (including the defense of claims brought by the Company, as a debtor-in-possession or otherwise, any secured or unsecured creditors of the Company, or any trustee or receiver in bankruptcy);

(b)     as a result of any environmental pollution, hazardous material or environmental clean-up relating to the Real Estate, the Company's operation and use of the Real Estate, and the Company's off-site disposal practices;

(c)     Omitted;

\

(d)     Omitted;

(e)     in connection with any regulatory investigation or proceeding by any regulatory authority or agency having jurisdiction over the Company; and

(f)     otherwise relating to or arising out of the transactions contemplated by this Agreement or any action taken (or failure to act) by any Indemnified Party with respect thereto;

provided that an Indemnified Party's conduct in connection with the any of the foregoing matters does not constitute gross negligence or willful misconduct, as finally determined by a court of competent jurisdiction.   This indemnification shall survive the termination of this Agreement and the payment and satisfaction of the Obligations.

**SECTION 11     MISCELLANEOUS**

**11.1     Waivers.** The Company hereby waives diligence, demand, presentment, protest and any notices thereof as well as notices of nonpayment, intent to accelerate and acceleration.  No waiver of an Event of Default by JMX shall be effective unless such waiver is in writing and signed by JMX.  No delay or failure of JMX to exercise any right or remedy hereunder, whether before or after the happening of any Event of Default, shall impair any such right or remedy, or shall operate as a waiver of such right or remedy, or as a waiver of such Event of Default.  A waiver on any one occasion shall not be construed as a bar to or waiver of any right or remedy on any future occasion. No single or partial exercise by JMX of any right or remedy precludes any other or further exercise thereof, or precludes any other right or remedy.

**11.2     Entire Agreement; Amendments; Sale of Interest.**

(a)     This Agreement : (a) constitutes the entire agreement between the Company and JMX; (b) supersede any prior agreements (including the agreements set forth in any commitment letter); (c) may be amended

18

only by a writing signed by the Company and JMX; and (d) shall bind and benefit the Company and JMX and their respective successors and assigns, except that the Company shall not have the right to assign (by operation of law or otherwise) its rights or obligations hereunder without the prior written consent of JMX.

      **(b)**    The Company hereby consents to JMX's participation, sale, assignment, transfer, pledge, encumbrance or other disposition, at any time or times hereafter, of this Agreement, or of any portion hereof or thereof, including, without limitation, JMX's rights, title, interests, remedies, powers, and duties hereunder or thereunder.

**11.3**    **Usury Limit.**    In no event shall the Company, upon demand by JMX for payment of any indebtedness relating hereto, by acceleration of the maturity thereof, or otherwise, be obligated to pay interest and fees in excess of the amount permitted by law. Regardless of any provision herein or in any agreement made in connection herewith, JMX shall never be entitled to receive, charge or apply, as interest on any indebtedness relating hereto, any amount in excess of the maximum amount of interest permissible under applicable law. If JMX ever receives, collects or applies any such excess, it shall be deemed a partial repayment of principal and treated as such. If as a result, the entire principal amount of the Obligations is paid in full, any remaining excess shall be refunded to the Company. This Section 11.3 shall control every other provision of the Agreement, the other Loan Documents and any other agreement made in connection herewith.

**11.4**    **Severability.**  If any provision hereof is held to be illegal or unenforceable, such provision shall be fully severable, and the remaining provisions of the applicable agreement shall remain in full force and effect and shall not be affected by such provision's severance. Furthermore, in lieu of any such provision, there shall be added automatically as a part of the applicable agreement a legal and enforceable provision as similar in terms to the severed provision as may be possible.

**11.5**    **WAIVER OF JURY TRIAL; JUDICIAL REFERENCE; SERVICE OF PROCESS.**

      **(a)**    TO THE EXTENT PERMITTED BY APPLICABLE LAW, THE COMPANY AND JMX EACH HEREBY WAIVE ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS OR THE TRANSACTIONS CONTEMPLATED THEREUNDER.

      **(b)**    THE COMPANY HEREBY IRREVOCABLY WAIVES PERSONAL SERVICE OF PROCESS AND CONSENTS TO SERVICE OF PROCESS BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED. IN NO EVENT WILL JMX BE LIABLE FOR LOST PROFITS OR OTHER SPECIAL OR CONSEQUENTIAL DAMAGES.

      **(c)**    IF (I) THE BANKRUPTCY CASE IS DISMISSED, (II) THE BANKRUPTCY COURT ABSTAINS FROM HEARING ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO) OR (III) THE BANKRUPTCY COURT REFUSES TO EXERCISE JURISDICTION OVER ANY ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS (OR IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO IN RESPECT OF THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS OR THE TRANSACTIONS RELATED HERETO OR THERETO), THEN ALL ACTIONS OR PROCEEDINGS IN ANY WAY, MANNER OR RESPECT, ARISING OUT OF OR FROM OR RELATED TO THIS AGREEMENTOR THE COLLATERAL SHALL BE LITIGATED IN COURTS \HAVING SITUS WITHIN THE CITY OF NEW YORK, STATE OF NEW YORK. THE COMPANY HEREBY CONSENTS AND SUBMITS TO THE JURISDICTION OF ANY LOCAL, STATE OR FEDERAL COURTS LOCATED WITHIN SAID CITY AND STATE. THE COMPANY HEREBY WAIVES ANY RIGHT IT MAY HAVE TO TRANSFER OR CHANGE THE VENUE OF ANY LITIGATION BROUGHT AGAINST THE COMPANY BY JMX IN ACCORDANCE WITH THIS SECTION.

**11.6**     **Notices.** Except as otherwise herein provided, any notice or other communication required hereunder shall be in writing (messages sent by e-mail or other electronic transmission (other than by telecopier) shall not constitute a writing, however any signature on a document or other writing that is transmitted by e-mail or telecopier shall constitute a valid signature for purposes hereof), and shall be deemed to have been validly served, given or delivered when received by the recipient if hand delivered, sent by commercial overnight courier or sent by facsimile, or three (3) Business Days after deposit in the United States mail, with proper first class postage prepaid and addressed to the party to be notified as follows:

(a)     if to JMX, at:     JMX Capital Partners, LLC
8214 Wellmoor Court
Jessup, Maryland 20794
Attn: Michael Zippelli, Manager
Fax No.: (443) 836-2399

With a copy to (which shall not constitute notice):

Herman Law LLC
1050 Winter Street, Suite 1000Waltham, MA 02451
Attn: Dimitry S. Herman, Esq.
Fax No.: (610) 646-9675

(b)     if to the Company, at:     Classic Sleep Products, Inc
8214 Wellmoor Court
Jessup, Maryland 20794
Attn: Michael Zippelli, President
Fax No.: (443) 836-2399

With a copy to (which shall not constitute notice)

:     Shulman, Rogers, Gandal, Pordy & Ecker, P.A.
11921 Rockville Pike, 3rd Floor
Rockville, Maryland 20852
Attn: Michael J. Lichtenstein, Esquire
Fax: (301) 230-2891

(c)     to such other address as any party may designate for itself by like notice.

**11.7**     **Counterparts; Electronic Execution.** This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement. Delivery of an executed counterpart of this Agreement by telefacsimile or by electronic transmission in "pdf" or other imaging format shall be equally as effective as delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by telefacsimile or electronic transmission also shall deliver an original executed counterpart of this Agreement but the failure to deliver an original executed counterpart shall not affect the validity, enforceability and binding effect of this Agreement.

**11.8    CHOICE OF LAW.  THE VALIDITY, INTERPRETATION AND ENFORCEMENT OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY THE LAWS OF THE STATE OF NEW YORK (WITHOUT REGARD TO ITS CONFLICTS OF LAWS PROVISIONS), EXCEPT TO THE EXTENT THAT ANY OTHER LOAN DOCUMENT INCLUDES AN EXPRESS ELECTION TO BE GOVERNED BY THE LAWS OF ANOTHER JURISDICTION.**

**11.9    Subordination Agreement.**  This Agreement, and all of JMX's rights and remedies hereunder, are subordinated to CIT and subject to the Subordination Agreement.

[Signatures on Next Page]

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed and effective by their proper and duly authorized officers as of the date set forth above.

**CLASSIC SLEEP PRODUCTS, INC.**                    **JMX CAPITAL PARTNERS, LLC**

By:_____          By:_____
Name:   Michael Zippelli                               Name:   Michael Zippelli
Title:    Chief Executive Officer and President     Title:    Manager

**SCHEDULE TO FINANCING AGREEMENT**
**AMONG CLASSIC SLEEP PRODUCTS, INC.**
**AND**
**JMX CAPITAL PARTNERS, LLC**

## SECTION 1  COMPANY INFORMATION

(a)  **Name of Company:**                           Classic Sleep Products, Inc.

(b)  **Type of Entity and State of Incorporation/Formation:**   A corporation, incorporated under the laws of Delaware

(c)  **Federal Employer ID #:**                     52-2262022

(d)  **State Organization # (if any):**             3266251

(e)  **Chief Executive Office Address:**            8214 Wellmoor Court, Jessup, Maryland 20794

(g)  **Subsidiaries**                               None

## SECTION 2  FINANCIAL COMMITMENTS

**2.1  JMX DIP Loan Maximum Amount:**               $1,000,000

## SECTION 3  INTEREST, FEES AND EXPENSES

**3.1  Interest Rate:**                             The Base Rate plus one and one-half of one percent (1.50%) per annum

## SECTION 4  COLLATERAL

**4.1  Real Estate Collateral:**                    N/A

**4.2  Collateral Reporting:**                      See Annex A attached hereto.

## SECTION 5  REPRESENTATIONS, WARRANTIES AND COVENANTS

**5.1  Financial Reporting:**                       Same as provided to CIT under the CIT DIP Credit Agreement.

B # 1051448 v.4